**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

**CHARLESTON DIVISION**

| | | |
|---|---|---|
| AKILIOU SMITH, | ) | C/A No.: 2:16-cv-0655-PMD-BM |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **PLAINTIFF'S MEMORANDUM** |
| | ) | **IN OPPOSITION TO DEFENDANTS'** |
| | ) | **SUMMARY JUDGMENT MOTION** |
| THE CHARLESTON COUNTY | ) | |
| SHERIFF'S OFFICE, JAMES L. JACKO, | ) | |
| DONALD STANLEY, | ) | |
| JOHN WIEDEMAN, ZACH LINDSAY, | ) | |
| And MATTHEW WEAN in their respective | ) | |
| INDIVIDUAL capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

COMES NOW Plaintiff, Akiliou Smith, by and through his undersigned counsel, in opposition to the Motion for Summary Judgment filed on behalf of all named Defendants pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff submits this Memorandum in Opposition, in accordance with the Local Civil Rules 7.05 and 7.06 of the United States District Court, District of South Carolina. This case arises out of the unlawful forced entry by Charleston County Sheriff's Office deputy sheriffs into Plaintiff, Mr. Smith's, home and the subsequent unlawful seizure and detention of Mr. Smith by threat of excessive force. Specifically, Defendants entered Mr. Smith's home without consent, without a warrant, and in the complete absence of exigent circumstances. Defendants then seized Mr. Smith without probable cause, as required for an arrest, and even without the lower standard of reasonable articulable suspicion that criminal activity was afoot, as Defendants erroneously contend is the standard to apply. Thereafter, Defendants threatened Mr. Smith to succumb to being handcuffed in his home and dragged out into his yard or be Tased by the Taser pointed at him by one of the deputies in his home.

Defendants violated Mr. Smith's Fourth Amendment right to be free from unreasonable search and seizure as incorporated by the Fourteenth Amendment of the United States Constitution. Plaintiff brings the present action for redress pursuant to 42 U.S.C. § 1983. Mr. Smith also brings claims pursuant to the common law of the State of South Carolina for Trespass, False Imprisonment, and Gross Negligence against the Charleston County Sheriff's Office.

Genuine issues of material fact exist as to all of Plaintiff's causes of action, and, as such, Defendants' Motion for Summary Judgment should be DENIED in its entirety.

## STATEMENT OF FACTS

On December 07, 2015, several deputies from the Charleston County Sheriff's Office kicked in the door to Plaintiff, Mr. Smith's, home and forced entry into his home without a warrant, consent, or exigent circumstances. (Charleston County Sheriff's Office Incident Report, Exhibit 1; Deputy Jacko Dep. p. 48, Exhibit 2; Deputy Lindsay Dep. pp. 77-79, Exhibit 3). After kicking in the door, the deputies placed Mr. Smith in handcuffs under threat of force, specifically the use of Taser aimed at Mr. Smith. (Jacko Dep. pp. 58-63, Exhibit 2). The deputies then forcibly removed Mr. Smith from his home against his will to the street and in public view to perform a show up identification procedure. (Incident Report, Exhibit 1; Jacko Dep. pp. 59-60, Exhibit 2). It was apparent upon sight that Mr. Smith was not close to matching the description provided of the suspect. (Deputy Moniz Dep. pp. 78-79; Exhibit 9). At all times relevant to this matter, Mr. Smith was on his own property and did nothing illegal to prompt his seizure and arrest. (Jacko Dep. pp. 74-76, Exhibit 2; Lindsay Dep. pp. 63-64, Exhibit 3). As soon as the deputies brought the burglary victim, Ms. Angielean Foggy, to see Mr. Smith in handcuffs in his front yard, Ms. Foggy informed the deputies that Mr. Smith was not the person that was in her home. (Charleston

2

County Sheriff's Office Incident Report, Exhibit 1).  Upon that information, the deputies had no choice but to release Mr. Smith.

The events leading up to the unconstitutional entry of Mr. Smith's home and his unlawful seizure include the following.  At 8:28 PM, Ms. Foggy called 9-1-1 and spoke to Charleston County consolidated dispatch.  (9-1-1 CAD Report, Exhibit 4).  Ms. Foggy advised that she came home to find an unknown man sitting in her house watching television.  (Exhibit 4).  Ms. Foggy advised dispatch that she told the unknown man to leave her house, and he did.  (Exhibit 4).  Ms. Foggy also provided a description to dispatch of the subject as a black male, wearing jeans and a jean jacket, between age 25 and 30 years old, five foot-five inches tall, weighing 150 pounds, with a short afro and possibly a little beard.  (Exhibit 4).  The subject left behind a green Rubbermaid container with a comforter blanket, clothing, and a basketball inside.  (9-1-1 Audio, Exhibit 5; CAD Report, Exhibit 4).  The subject also knew one of Ms. Foggy's daughters by name.  (9-1-1 Audio, Exhibit 5).  After being on the phone with dispatch for approximately ten minutes, the subject came back and asked to get his things out of Ms. Foggy's home. *Id*.  She told him, "no," and he left again.  *Id*.  Charleston County dispatch indicated "no one is reported to be in danger." *Id*.  Consolidated Dispatch relayed this information to Deputy Jacko and the other sheriff's officers.  (Jacko Dep. pp. 46-47, Exhibit 2).

Approximately thirty minutes after the initial 9-1-1 call, Deputy Jacko and other sheriff's office deputies arrived at Ms. Foggy's house.  (CAD Report, Exhibit 4).  Ms. Foggy reiterated the description to Deputy Jacko at that time and specified that the subject was wearing "blue jeans, a blue jean jacket, and had a goatee."[1]  (Incident Report, Exhibit 1; Jacko Dep. pp. 46-47, Exhibit 2).

---

[1] There is nothing in the record to indicate that Ms. Foggy gave anything but an accurate and

After approximately thirty more minutes (an hour after the initial call to 9-1-1), Deputy Lindsay arrived to Ms. Foggy's residence. (Lindsay Dep. pp. 46-47, p. 49, ll. 10-13; Exhibit 3). Deputy Lindsay is a deputy sheriff and K-9 handler at the Charleston County Sheriff's Office. (Lindsay Dep. p.13, ll. 13-23; Exhibit 3). The detailed description of the suspect was relayed to Deputy Lindsay. (Lindsay Dep. pp. 38-39; Exhibit 3). Deputy Lindsay spoke to the other deputy sheriffs at the scene to determine whether the suspected offense would justify the use of a K-9. (Lindsay Dep. p. 27, ll. 1-23; Exhibit 3). Deputy Moniz changed the call-out from a trespassing offense to a burglary offense, because the air-conditioning unit had been moved out of the window and belongings had been moved from one room to another within the home. (Jacko Dep. pp. 44-45; Exhibit 2).

Deputy Lindsay was wearing green BDU military-style pants, a black shirt, and a black vest with the sheriff's star on the left side. (Lindsay Dep. p. 25-26; Exhibit 3). Deputy Lindsay began to use the K-9 to find a potential track of the suspect followed by Deputy Jacko and Deputy Moniz. (Lindsay Dep. p. 45, ll. 3-14; Exhibit 3; Jacko Dep. p. 30, ll. 5-22; Exhibit 2). The K-9 went down Ghana Street and turned onto Kano Street. (Lindsay Dep. p. 56-57; Exhibit 3). Approximately half way down Kano Street, the K-9 lifted his head and began to sniff the air. *Id.* The air sniff indicated that "the dog is no longer smelling a track," and there is some person nearby. *Id.* The purpose according to Defendant Lindsay is that it is "a good safety thing for [police]." (Lindsay Dep. p. 57-58; Exhibit 3). However, the K-9 does not differentiate one person from another by scent but simply indicates that some person is in proximity. *Id.* In particular, the K-9 did not specifically detect the burglary suspect's presence.

---

complete description of the suspect she witnessed in her home. Deputy Jacko agreed that Ms. Foggy had as good an opportunity to view the suspect as possible. (Jacko Dep. pp. 88-89, Exhibit 2).

At this same time, Akiliou Smith was standing by his back door at the back end of his driveway smoking a cigarette, after having just taken the trash outside behind the home. (Plaintiff Dep. p. 29, ll. 15-24; Exhibit 6). Mr. Smith lived at 3580 Kano Street with his wife, newborn son, two daughters, mother-in-law, and brother-in-law. (Plaintiff Dep. p. 7, ll. 12-24; Exhibit 6). Photographs of Mr. Smith's home, Ms. Foggy's home, and the Ghana-Kano Street area are attached hereto as Exhibit 7. Mr. Smith had recently gotten home from taking his daughters to choir practice at their church. (Plaintiff Dep. p. 29, ll. 9-13; Exhibit 6).

While Mr. Smith was standing by his back door, finishing his cigarette, he saw a man with a dog, who called out to him, "Hey, you, come here." *Id.* Confronted by this unknown subject, Mr. Smith retreated to the safety of his home through the door near his driveway and locked the door. (Plaintiff Dep. pp. 29-30 and pp. 34-35; Exhibit 6; Tonya Davis Dep. pp. 28-29; Exhibit 8). When Mr. Smith got inside his home, he called 9-1-1 and reported the unknown man with a dog outside his house. (Plaintiff Dep. p. 37, ll. 9-24; Exhibit 6). The audio recording from both Ms. Foggy's and Mr. Smith's 9-1-1 calls is attached hereto as Exhibit 5; Mr. Smith's 9-1-1 call begins at the 33:54 mark of the audio file. The deputy sheriff did not identify himself as law enforcement. (Plaintiff Dep. p. 40, ll. 20-22; Exhibit 6; Lindsay Dep. pp. 61-62; Exhibit 3).

Deputy Lindsay was at the top of the driveway and proceeded after Mr. Smith down the driveway to the door where Deputy Lindsay immediately started banging on the door and trying to kick it in. (Lindsay Dep. pp. 76-79; Exhibit 3). The door was locked, and there was no sign of forced entry. (Lindsay Dep. p. 76, ll. 2-18; Exhibit 3). No factual basis existed to believe Mr. Smith was a threat of danger to any person or that he was the burglary suspect. (Lindsay Dep. pp. 97-98; Exhibit 3; Jacko Dep. pp. 47-48; Exhibit 2). Mr. Smith's physical appearance was not close to the description provided of the suspected burglar. (Moniz Dep. pp. 78-79; Exhibit 9). Mr.

Smith was wearing his work uniform of khaki cargo pants and his green Atlantic Pest Control jacket with a big Atlantic logo on the chest. (Plaintiff Dep. p. 66, ll. 19-24; Exhibit 6). The suspect was wearing blue jeans and a blue jean jacket. (Incident Report, Exhibit 1). Mr. Smith weighs approximately 220 pounds. (SCDMV Record; Exhibit 10). The suspect was described as weighing 150 pounds. (Incident Report, Exhibit 1). The only commonalities between Mr. Smith and the suspect were that they are both African American males.

Additionally, when the sheriff's deputies were banging on the door, the residents from the other side of the closed door vocalized to the deputies that there was no burglar in the home and that the deputies did not have permission to come into the home. (Davis Dep. p. 29; Exhibit 8; Domonique Smith Dep. p. 29, ll. 2-16; Exhibit 11; Jacko Dep. p. 51, ll. 4-12; Exhibit 2).

However, despite the fact that the home's residents told the deputies that they did have permission to enter the home, despite there being no basis to believe anyone was in danger, and despite that Mr. Smith did not match the description provided of the suspect in any way except he is a black male, the deputy sheriffs kicked in Mr. Smith's door, proceeded to point a Taser at him and put him in handcuffs, and drag him out of his home against his will. All of these acts are in violation of Mr. Smith's constitutionally guaranteed right to be free from unreasonable search and seizure.

## **STANDARD OF REVIEW**

There are genuine issues of material facts such that above-named Defendants are not entitled to summary judgment. Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is warranted "only when

it is clear there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Caltrett*, 477 U.S. 317, 323 (1986). Moreover, when resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. *See Rainey v. Conerly*, 973 F.2d 321, 323–24 (4th Cir. 1992) (affirming denial of summary judgment to prison guard on qualified immunity grounds where the trier of fact's determination of "what actually happened" in the excessive force case was "absolutely necessary" to resolve whether the guard could reasonably believe that his actions were lawful for purposes of qualified immunity); *Davis v. Zahradnick*, 600 F.2d 458 (4th Cir. 1979).

There are genuine issues of material facts as to the Defendants' actions towards Mr. Smith on the night of December 7, 2015. Accordingly, summary judgment must be denied, and the case submitted for factual determinations by a jury. *Rainey v. Conerly*, 973 F.2d at 323–24 (4th Cir. 1992).

## I.     DEFENDANTS VIOLATED MR. SMITH'S RIGHT TO BE SECURE IN HIS PERSON AND HOUSE AGAINST UNREASONABLE SEARCHES AND SEIZURES.

The heart of this case concerns Mr. Smith's constitutional protections afforded by the Fourth Amendment, namely:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

U.S. CONST. amend. IV. Defendants violated Mr. Smith's Fourth Amendment rights when they forcibly entered Mr. Smith's home without consent, without a warrant, and in the absence of exigent circumstances. *See, e.g., Kentucky v. King*, 563 U.S. 452, 459–61 (2011) (internal citations omitted). Once in Mr. Smith's home, Defendants conducted an unlawful search for him and unlawful seizure of his person, again in violation of Mr. Smith's Fourth Amendment rights.

The Fourth Amendment "unequivocally establishes the proposition that 'at the very core [of it] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Payton v. New York*, 445 U.S. 573, 589-90 (1980). (*citing Silverman v. United States*, 365 U.S. 505, 511 (1961)). As the Supreme Court noted, "[t]he zealous and frequent repetition of the adage that a 'man's house is his castle,' made it abundantly clear that both in England and the Colonies 'the freedom of one's house' was one of the most vital elements of English liberty." *Id.* at 596-97. Accordingly, "the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Id.*

The Fourth Amendment requires, first, that all searches and seizures be reasonable and, second, that a warrant for a search may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity. *Id.* at 584. Furthermore, it is the "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 585-86. The Supreme Court recognizes that this presumption may be overcome based on certain reasonable exceptions, based on "the ultimate touchstone of the Fourth Amendment" being "reasonableness". *E.g.*, *Kentucky v. King*, 563 U.S. 452, 459–61 (2011) (internal citations omitted).

One exception to the warrant requirement is when "'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable

under the Fourth Amendment." *Id. (quoting Mincey v. Arizona,* 437 U.S. 385, 394 (1978)); *see also Payton,* 445 U.S. at 590 ("the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."). Common sense underlies the exigency exception to the warrant requirement: "Any warrantless entry based on exigent circumstances must, of course, be supported by a genuine exigency." *Id.* at 470.

Furthermore, the Supreme Court has identified several exigencies that may justify a warrantless search of a home, which include: (1) the emergency aid exception where "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury," *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006), and (2) where the officers are in hot pursuit of a fleeing suspect, *United States v. Santana,* 427 U.S. 38, 42–43 (1976). Thus, the Fourth Amendment allows for dispensing with the warrant requirement when the exigent circumstances, again, make it reasonable to do so.

However, in order for the exigent circumstances to justify a warrantless entry of a home, the conduct of the police preceding the exigency must be reasonable in the same sense. *Kentucky v. King*, 563 U.S. at 462. The Supreme Court specifically held in the *King* case that the "exigent circumstances rule applies when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment." *Id.* Accordingly, if the police create the exigency by engaging in or threatening to engage in conduct that violates the Fourth Amendment, the ensuing forced entry of the home is unconstitutional. *Id*. The Supreme Court even noted in its *King* decision:

> There is a strong argument to be made that, at least in most circumstances, the exigent circumstances rule should not apply where the police, without a warrant or any legally sound basis for a warrantless entry, threaten that they will enter without permission unless admitted. In this case, however, no such

9

actual threat was made, and therefore we have no need to reach that question.

*Id.* at N. 4.

In the case at hand, it must not be overlooked that the Fourth Amendment protections mean that "[w]hen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak." *Id.* at 469-470. To reiterate, the occupant has no obligation to open the door or to speak to law enforcement without a warrant or in the absence of exigent circumstances that are not created by law enforcement themselves. Moreover, if the occupant so chooses to open the door and speak to law enforcement, he then has no obligation to allow the officers to enter the premises and may refuse to answer any questions at any time. *Id.* at 470.

Therefore, basic constitutional principles at issue in the present case are that the deputies either needed a warrant before they could enter Mr. Smith's home or they needed a legally sound basis to enter, that being exigent circumstances that the deputies themselves did not create. Neither were present on the night the deputies forcibly entered Mr. Smith's home. The deputies threatened to violate Mr. Smith's Fourth Amendment rights prior to their entry into his home, by chasing him to his home's door, proceeding to bang on the door and threaten entry, and then act on that threat by forcibly kicking in the door and entering. In short, the deputies' unlawful conduct prior to their entry into Mr. Smith's home cannot form the basis of their argument now of exigent circumstances leading to their entry.

There is no dispute that Defendants did not have consent or a warrant to enter Mr. Smith's home. (Jacko Dep. p. 48, Exhibit 2; Lindsay Dep. pp. 77-79, Exhibit 3). Further, no exigent

10

circumstances existed until the deputies created the circumstances of scaring Mr. Smith into entering his own home and calling 9-1-1. Nothing Mr. Smith did lent itself to creating exigent circumstances and nothing about the circumstances at all rose to the level of exigency— Mr. Smith specifically did not match the suspect's description in regards to build, clothing, and hair, and only matched in that he is also a black male. Moreover, Mr. Smith was peacefully standing in his own driveway right by his own home, in a residential area. Mr. Smith was at all times on his own property near his back door within the curtilage of the home. (Plaintiff Dep. p. 29, Exhibit 6; Jacko Dep. pp. 74-75, Exhibit 2). He did not struggle or have any issues with his door upon entering his house. (Plaintiff Dep. p. 38, ll.16-19; Exhibit 6). Deputy Lindsay and Deputy Jacko both admitted there were no signs of forced entry into Plaintiff's home. (Lindsay Dep. p. 76, ll. 2-18, Exhibit 3; Jacko Dep. pp. 31-32; Exhibit 2). Additionally, it was an hour and a half after the burglary reported by Ms. Foggy.

Furthermore, Defendants' admit that Mr. Smith's physical appearance was not close to the description provided of the suspected burglar. (Moniz Dep. pp. 78-79; Exhibit 9). Mr. Smith was wearing his work uniform of khaki cargo pants and his green Atlantic Pest Control jacket with a big Atlantic logo on the chest. (Plaintiff Dep. p. 66, ll. 19-24; Exhibit 6). The suspect was wearing blue jeans and a blue jean jacket. (Incident Report, Exhibit 1). Mr. Smith weighs approximately 220 pounds. (Driving History; Exhibit 10). The suspect was described as weighing 150 pounds. (Incident Report, Exhibit 1).

Moreover, the Defendants' expert, Don Wieder, testified the Rubbermaid container left behind by the burglary suspect with a blanket and clothing would indicate to a reasonable law enforcement officer that the suspect would be possibly homeless but certainly did not live in a nearby home within the neighborhood. (Wieder Dep. pp. 63-64; Exhibit 12). In contrast, Mr.

11

Smith lived at the house on Kano Street and the deputies were informed as much. (Davis Dep. p. 29, ll. 15-17; Exhibit 8). There are absolutely no particularized facts that Mr. Smith was the burglary suspect who the deputies were looking for that created exigent circumstances that Mr. Smith was a fleeing felon.

While Deputy Lindsay testified he believed the people in the home were in danger because of "a lot of loud noise and commotion and people walking around" inside (Lindsay Dep. p. 63, ll. 17-22; Exhibit 3), once the deputies banged on the door, immediately from the other side of the door the residents told the deputies they did not have permission to come inside and there was no need for them to come inside (Plaintiff Dep. p. 39, ll. 10-15; Exhibit 6; Davis Dep. p. 29; Exhibit 8). In addition, prior to that evening, Deputy Moniz knew Ms. Davis, who lived at the house and is Mr. Smith's mother-in-law, as a law-abiding citizen who had called police to report crimes committed by her neighbors. (Moniz Dep. pp. 70-71; Exhibit 9).

In sum, the deputies had no warrant, consent, or exigency to base kicking the home's door in and entering the home. The Defendant deputies' actions of threatening to violate Mr. Smith's Fourth Amendment rights against unreasonable search and seizure by banging on the door, demanding and threatening entry and seizure, and then kicking the locked door open absolutely do not create "exigent circumstances" that the deputies can now rest on to validate their unconstitutional entry into Mr. Smith's home. Mr. Smith was not required to speak to the deputies based on an exigency the deputies created themselves. Further, Mr. Smith had no obligation to open the door for the deputies or speak to the deputies without a warrant. The Fourth Amendment protects Mr. Smith. The deputies in forcing entry into his home clearly violated Mr. Smith's constitutional right against unreasonable search and seizure in his home. *See King*, 563 U.S. at 469-70.

Thereafter, the deputies again violated Mr. Smith's Fourth Amendment rights by seizing him without a warrant or probable cause and, specifically, by excessive force.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. CONST. amend. IV. "An arrest is a seizure of the person." *Wilson v. Kittoe*, 337 F.3d 392, 398 (4th Cir. 2003). "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891). "Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Id*. The Fourth Circuit has reiterated this fundamental rule: "**an official seizure of the person must be supported by probable cause, even if no formal arrest is made**." *United States v. Watson*, 703 F.3d 684, 689 (4th Cir. 2013) (emphasis added) (quoting *Michigan v. Summers*, 452 U.S. 692, 696 (1981)). An officer has probable cause for arrest when the "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id*.

"The requirement of probable cause has roots that are deep in our history" in regards to Fourth Amendment seizures. *Henry v. United States,* 361 U.S. 98, 100 (1959). The Supreme Court has explained the historical basis of probable cause to seize and arrest in our country:

> Hostility to seizures based on mere suspicion was a prime motivation for the adoption of the Fourth Amendment, and decisions immediately after its adoption affirmed that "common rumor or report, suspicion, or even 'strong reason to suspect' was not adequate to support a warrant for arrest."

*Dunaway v. New York*, 442 U.S. 200, 213 (1979) (quoting *Henry*, 361 U.S. at 101). Thus, the "threshold standard of probable cause for Fourth Amendment seizures reflects the benefit of

13

extensive experience accommodating the factors relevant to the 'reasonableness' requirement of the Fourth Amendment, and provides the relative simplicity and clarity necessary to the implementation of a workable rule." *Id.* (citing *Brinegar v. United States,* 338 U.S. 160, 175–176, (1949)).

Accordingly, the deputies here violated Mr. Smith's Fourth Amendment right when they seized him without probable cause that he had committed a crime, was committing a crime, or was about to commit a crime. Further, the deputies specifically seized Mr. Smith based on unconstitutional "mere suspicion" and, once they saw him in the privacy of his own home, that unconstitutional "mere suspicion" immediately was dispelled because Mr. Smith did not match the suspected burglar's description. Yet, the deputies continued to violate Mr. Smith's protections afforded under our Constitution by not only seizing him without probable case but threatening him with the Taser to submit himself to being handcuffed and placed in their custody.

The Supreme Court holds that claims of excessive force during an arrest, investigatory stop, or other seizure are evaluated under a Fourth Amendment objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness standard.'"). The deputies' seizure and concurrent use of aiming a Taser at Mr. Smith are objectively unreasonable and even further violated Mr. Smith's Fourth Amendment rights. [2]

In sum, Defendants' forced entry into Mr. Smith's home and seizure of Mr. Smith was without consent, without a warrant, and in the absence of exigent circumstances, and violated Mr. Smith's Fourth Amendment rights against unreasonable search and seizure of his person and home.

---

[2] See Section II.C for further analysis and argument.

Defendants are not entitled to summary judgment on Mr. Smith's claims against them under § 1983.

## II. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY BECAUSE DEFENDANTS VIOLATED MR. SMITH'S CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS.

The guarantees of the Fourth Amendment as they pertain to Mr. Smith were clearly established at the time of the unconstitutional forced entry and seizure by Defendants. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotations omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The qualified immunity defense shields a government official from civil monetary damages where, in the performance of "discretionary functions," his conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. Thus, government officials are not entitled to qualified immunity when a § 1983 claim satisfies the following two-prong test: "(1) the allegations underlying the claim, if true, substantiate a violation of a federal statutory or constitutional right; and (2) this violation was of a clearly established right of which a reasonable person would have known." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006) (internal quotation marks omitted). The government official bears the burden of proof and persuasion to establish the defense of qualified immunity.[3] *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003); *Elder v. Holloway*, 510 U.S. 510 (1994).

Further, a government official is entitled to qualified immunity only when "there is no

---

[3] Defendants' attempt to shift the burden stating, "Defendants suspect Plaintiff will be unable to identify any precedent" is an incorrect statement of the law.

genuine issue of material fact and when the undisputed facts establish that the defendant is entitled to judgment as a matter of law. *Id*. at 397; *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 ("But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."). Whether a right is clearly established is determined by looking at "the contours of the right;" but "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful…" *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Instead, the United States Supreme Court explains:

> [G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful.

*Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (citations omitted).

Moreover, the Fourth Circuit said, "'the nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent denial of qualified immunity." *Edwards v. City of Goldsboro,* 178 F.3d 231, 251 (4th Cir.1999) (quoting *Jean v. Collins,* 155 F.3d 701, 709 (4th Cir.1998) (en banc)). And, "qualified immunity was never intended to relieve government officials from the responsibility of applying familiar legal principles to new situations." *Id.* (citing *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir.2001) (Michael, J., concurring)). General statements of the law can be sufficient to give a government official clear and fair warning. *Hope v. Pelzer*, 536 U.S. at 739-40.

### A.    Defendants Violated Plaintiff's Clearly Established Right to be Secure in His Home Against Unreasonable Searches and Seizures.

It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.[4]  *Brigham City v. Stuart*, 547 U.S. 398, 403

---

[4] The Fourth Amendment also protects against unreasonable government intrusion into the

(2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)).  The Supreme Court has held that no reasonable officer can "claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional." *Covey v. Assessor of Ohio County*, 777 F.3d. 186, 196 (4th Cir. 2015).

It is undisputed that the law enforcement officers here did not have a warrant or consent to enter Mr. Smith's home.  As addressed earlier, the Fourth Amendment does allow certain limited exceptions to the warrant requirement known as "exigent circumstances."    An exigent circumstance applies when "'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Mincey,* 437 U.S. at 394; *see also Payton* at 590 ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant").   The government bears the burden of demonstrating the existence of exigent circumstances to overcome the presumption of unreasonableness in the entry without a warrant.  *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984).

Defendants do not point to any specific exigency that would authorize the warrantless search of Plaintiff's home.  Instead Defendants attempt to set out the law of exigencies generally and then attempt to argue they had "an objectively reasonable perception of an emergency."  (Dk. No. 60-1).  Defendants baldly argue they were reasonable to believe "a burglar had just entered the home," and "the occupants of the home needed help" articulating no facts that such was reasonably the case.  *Id*.

---

curtilage of one's home to the same degree as the interior of the home.  *Covey v. Assessor of Ohio County*, 777 F.3d 186, 196 (4th Cir. 2015).

To invoke the so-called "emergency doctrine" the official must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within." *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992). The Fourth Circuit has emphasized that the "emergency exigency" exception to the warrant requirement justifies "entry as an incident to the service and protective functions of the police as opposed to . . . their law enforcement functions." *Id*. The government bears the burden of demonstrating the existent of exigent circumstances to overcome the presumption of unreasonableness. *Welsh*, 466 U.S. at 750.

Furthermore, the Charleston County Sheriff's Office policies and procedures defines and sets out the warrant requirement and the exceptions.[5] (CCSO Policy 6-03; Exhibit 13). The policy sets out the exceptions to the warrant requirement authorized for "emergency searches" in order to: 1) protect life and safety; 2) arrest a fugitive in hot pursuit; and/or 3) preserve evidence being destroyed or removed. *Id*. The policy states further that "[s]uch entries and searches can be made **only under extraordinary circumstances**." *Id*. (emphasis added). Defendants are attempting to make their unconstitutional conduct constitutional by claiming an "emergency search" was justified to protect life and safety or that they were in the hot pursuit of a fugitive, Mr. Smith. Neither are supported by the facts.

Defendants were neither in "hot pursuit" of a burglar nor reasonable in a belief the occupants of Mr. Smith's home needed any help. Hot pursuit is an exigency justified when law enforcement has probable cause to believe the suspect committed a crime and the pursuit is immediate and continuous from the scene of the crime. *Welsh*, 466 U.S. at 753. Defendants did

---

[5] Interestingly, the policy and procedure on arrests specifically cites to *Welsh v. Wisconsin*, 466 U.S. 740 (1984).

18

not have probable cause or even reasonable suspicion to believe Mr. Smith was the burglary suspect. *See, e.g., Id.* (search not justified by hot pursuit because no immediate or continuous pursuit of suspect from crime scene); *Hogan v. Cunningham*, 722 F.3d 726, 732-33 (5th Cir. 2013) (entry not justified by hot pursuit because suspect was in house when officers arrived and did not retreat from public place); *Smith v. Stoneburner*, 716 F.3d 926, 931-32 (6th Cir. 2013) (entry not justified because officer did not start to arrest suspect until after he entered home, and no emergency necessitated immediate police action); *U.S. v. Struckman*, 603 F.3d 731, 744 (9th Cir. 2010) (entry not justified by hot pursuit because defendant was in fenced-in yard when officers arrived and there was no pursuit).

Defendants first encountered Mr. Smith when he was standing on his own property and within the curtilage of his home, by his back door, smoking a cigarette. (Jacko Dep. p. 74-75; Exhibit 2). Defendants did not chase him from the scene of Ms. Foggy's house and, instead, encountered him approximately an hour and a half after the initial suspicious person call by Ms. Foggy. (9-1-1 CAD Report, Exhibit 4; Lindsay Dep. p. 67, ll. 20-23, Exhibit 3). Mr. Smith did not do anything illegal or unlawful to prompt the initiation of chase by law enforcement or even engage with law enforcement at all. (Lindsay Dep. pp. 65, Exhibit 3; Jacko Dep. p. 75, ll. 3-14, Exhibit 2). Mr. Smith was minding his own business on his own property. Deputies were not in hot pursuit of Mr. Smith as a fleeing felon; thus, there is no exigency here to justify the deputies' home invasion.

Further, Mr. Smith's physical appearance was not close to the description of the suspect.[6] (Moniz Dep. pp. 78-79; Exhibit 9). Mr. Smith weighs approximately seventy pounds more than

---

[6] Accepting the facts in the light most favorable to Defendants, which summary judgment does not allow, Deputy Lindsay only saw Plaintiff for a few moments and was not able to tell whether he matched the description of the burglary suspect or not. (Lindsay Dep. p. 70, ll. 9-21, Exhibit

the suspect and was wearing different clothing than the suspect. (Incident Report, Exhibit 1; Plaintiff Dep. p. 66, ll. 19-24; Exhibit 6). Mr. Smith was wearing his work uniform emblazoned with Atlantic Pest Control and khaki pants. (Plaintiff Dep. p. 66, ll. 19-24; Exhibit 6). The suspect was wearing blue jeans and a blue jean jacket. (Incident Report, Exhibit 1; Jacko Dep. p. 46-47, Exhibit 2).

Defendants encountered Mr. Smith during the nighttime in a dimly lit rural residential area of Johns Island on the property of a private residence, at the back of his driveway, right next to his home. (Jacko Dep. p. 74-75; Exhibit 2). Deputy Lindsay failed to identify himself as law enforcement.[7] (Plaintiff Dep. p. 40, ll. 20-22; Exhibit 6; Lindsay Dep. pp. 61-62; Exhibit 3). Deputy Lindsay wore green pants and a black shirt that only indicated he was law enforcement by a sheriff's star patch on the shoulder, and he was at the far end of the driveway away from Mr. Smith's home. (Lindsay Dep. p. 25, ll. 10-25; Exhibit 3). Mr. Smith only saw a man with a dog and a flash light attempting to confront him on his own property. (9-1-1 Audio; Exhibit 5). Bottom line, Mr. Smith was not a fugitive for purposes of hot pursuit; he was not fleeing, running, or moving from law enforcement. He was standing on his property smoking. (Jacko Dep. p. 75, ll. 4-14; Exhibit 2). Mr. Smith reasonably and expectantly retreated to the safety of the interior of his home and locked the door after being confronted by Deputy Lindsay yelling at him. Mr. Smith

---

3). However, even this is a constitutionally deficient basis to force entry into Plaintiff's home.

[7] To the degree Defendants rely on the K-9 track, this reliance has no factual value. The K-9 track did not lead to Plaintiff's home but rather diverted from his track and performed an "air sniff" when the K-9 smelled a person in the vicinity. The K-9 cannot tell which person he detects but simply that some person is nearby, which is a safety indicator for the K-9 handler. But "the dog is no longer smelling a track." (Lindsay Dep. pp. 56-58; Exhibit 3). In essence, the K-9 provided no detection of the specific suspect from Ms. Foggy's.

also called 9-1-1 to alert the police as to the unknown person with a dog who confronted him and chased him into his own house.  (9-1-1 Audio; Exhibit 5).

Defendants had absolutely no reasonable suspicion, let alone probable cause, to believe Mr. Smith was the burglary suspect.  Moreover, the deputies did not have an objectively reasonable belief anyone in the house was in immediate danger.  *U.S. v. Moss*, 963 F.2d at 678.  There is no indication that the burglary suspect posed a danger to any person.  In fact, when Ms. Foggy asked the suspect to leave her home he complied with her request indicating there was no danger.  (Jacko Dep. pp. 43-44; Exhibit 2).  He did not threaten her in any manner whatsoever.  (Jacko Dep. p. 46; Exhibit 2).  When asked in his deposition if there was "any basis to believe that anybody, relating to this burglary or trespassing, was in any danger whatsoever," Deputy Jacko responded, "No."  *Id.*  The burglary was investigated for a possible larceny or theft and unrelated to any crime or act of violence.  (Jacko Dep. p. 46, ll. 4-8; Exhibit 2).   In *Welsh v. Wisconsin, t*he Supreme Court approvingly cited a case from Illinois stating that a "burglary without weapons not grave offense of violence" for purposes of exigent circumstances doctrine.  466 U.S. at 752.

Plaintiff's counsel asked Deputy Lindsay, "do you have any factual basis to believe that Mr. Smith posed a danger to any person's life . . . or safety."  (Lindsay Dep. p. 98, ll. 3-10; Exhibit 3).  Deputy Lindsay admitted there was no factual basis to think anyone was in danger.  *Id.* Furthermore, when the officers got to the door and were banging on the door, the residents verbally informed them from the other side of the door that the person inside lived there and was not a burglar.  (Plaintiff Dep. p. 39, ll. 10-15; Exhibit 6; Davis Dep. p. 29; Exhibit 8).  At this point, no exigency existed to continue attempting to enter the home— no pursuit of the suspect or to protect anyone inside from danger.  The residents were also telling the deputies that they did not have permission to come inside the house.  *Id.*  And that there were young children inside the house.

*Id.* Additionally, Mr. Smith was calling the police himself from the home. (9-1-1 Audio; Exhibit 5).

Then, once deputies forced themselves into the home, the deputies' purported belief that the occupants were in danger is belied by the fact that they immediately could see and determine that (1) no one was in danger and (2) Mr. Smith did not match the burglary suspect. At this second point, no exigency existed and with it, no reasonable basis for the deputies to stay in the home. Once inside, Defendants asked "Where is he? We need to speak to him" and demanded to get to him even though the occupants were telling law enforcement they were not in danger. (Jacko Dep. pp. 54-56; Exhibit 2). Deputy Jacko's actions demonstrate that Defendants were not actually concerned with any person's safety. Nevertheless, Defendants intentionally and knowingly remained in Plaintiff's home. (Jacko Dep. p. 57-58; Exhibit 2). Further, the deputies not only stayed, but seized Mr. Smith, clearly violating his Fourth Amendment rights. The Defendants handcuffed Mr. Smith in front of his children and then forcibly removed him from his home in handcuffs.

In sum, Mr. Smith's right to be secure in his home against unreasonable searches and seizures was clearly established at the time of the deputies' conduct and "the allegations underlying the claim, if true, substantiate a violation of a federal statutory or constitutional right". *See Ridpath*, 447 F.3d at 306. Defendants are not entitled to qualified immunity.

**B.      Defendants Violated Mr. Smith's Clearly Established Right to be Free from Unreasonable Seizure.**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. CONST. amend. IV. The "general right to be free from an unlawful arrest is of course clearly established-under the Fourth Amendment, [and] police officers must have probable cause before they arrest a suspect." *Ferguson v. Taylor*, 933

F.2d 1001 (4th Cir. 1991).  Without a doubt, Mr. Smith's constitutional right against unreasonable seizure was clearly long established at the time of the deputies' actions.

Defendants erroneously argue that the deputies' conduct in seizing Mr. Smith should not be analyzed based on probable cause but rather based on the reasonable articulable suspicion standard from *Terry v. Ohio*, 392 U.S. 1 (1968).  Under *Terry*, police may stop and detain a person briefly for questioning upon suspicion that he may be connected with criminal activity.  *Terry*, 392 U.S. at 10.  An individual may be arrested only if probable cause exists that he committed the crime.  *Id.*  The Supreme Court's decision in *Terry* did not do away with the "long-prevailing standards" of probable cause required for arrest.  *See Dunaway v. New York*, 442 U.S. at 211-12. Instead the Court when faced with a very specific type of encounter between police and individuals in public held that the officers may make a very limited brief stop of the individual to investigate so long as they have reasonable articulable suspicion crime may be afoot, "only because these intrusions [fall] far short of the kind of intrusion associated with an arrest".  *Id.*

Furthermore, the Supreme Court refuses to extend the standard for a *Terry* investigative stop beyond its limited scope.  *E.g.*, *Dunaway*, 442 U.S. at 216 (holding probable cause required to seize someone for custodial interrogation); *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975) (holding that due to the limited nature of the intrusion of roving border patrols stopping autos to check for illegal immigrants for brief questioning "stops of this sort may be justified on facts that do not amount to the probable cause required for an arrest"; "officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but **any further detention or search must be based on consent or probable cause**.") (emphasis added).

Quite simply, Defendants advocate for applying the reasonable articulable suspicion standard to the deputies' conduct here of forcibly entering Mr. Smith's home and seizing him because they cannot meet the applicable standard of probable cause for the seizure of Mr. Smith. However, the in-home seizure of Mr. Smith was not an investigatory stop in public, and *Terry* does not apply.

*Terry* and its rules for when an investigative stop and frisk may occur is predicated on "an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." *Terry*, 392 U.S. at 20. In order to briefly stop someone in public for investigative purposes, the *Terry* rule is that

> the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate.

*Id*. at 21-22.

Thus, to even conduct an investigatory stop in public, law enforcement must have reasonable articulable suspicion crime is afoot; "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result [the] Court has consistently refused to sanction. *Id.* at 22. The reasonable suspicion must be based on objective facts, because, "[i]f subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers and effects,' only in the discretion of the police." *Id.* Accordingly, "[r]easonable

24

suspicion" is demonstrated when an officer "point[s] to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008).

The standard for a *Terry* investigative stop in public does not apply to seizing someone in his home. The Ninth Circuit specifically commended the government for not even trying to defend the application of the *Terry* exception to in-home searches and seizures as it is apparent that an in-home seizure is not the type of investigatory stop in public that *Terry* addresses. *U.S. v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010). It is obvious that a brief investigative stop is something completely different from the forced entry into Mr. Smith's home, where he was seized in handcuffs under threat that he would be Tased, and then removed from his home against his will, such that the *Terry* standard does not apply and instead the deputies needed probable cause to arrest Mr. Smith. *See Florida v. Royer*, 460 U.S. 491 (1983) (holding police exceeded limits of investigatory stop when asked defendant to accompany them to small police room, retained his plane ticket and driver's license and indicated in no way that he was free to go).

"*Terry* and its progeny…created only limited exceptions to the general rule that seizures of the person require probable cause to arrest." *Id*. at 499. Specifically, law enforcement's actions to investigate a crime do not negate the requirement for probable cause to seize someone for questioning in that investigation. *Id.* ("Detentions may be 'investigative' yet violative of the Fourth Amendment absent probable cause."). The Supreme Court specifically has rejected the argument that questioning during an investigation does not require probable cause to detain someone:

> to argue that the Fourth Amendment does not apply to the investigatory stage is fundamentally to misconceive the purposes of the Fourth Amendment. Investigatory

25

seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed "arrests" or "investigatory detentions".

*Dunaway*, 442 U.S. at 214-215 (holding detention during an investigation requires probable cause that crime was committed) (citing *Davis v. Mississippi*, 394 U.S. 721, 726-727 (1969)).

Accordingly, the reasonable articulable suspicion standard does not apply to the deputies' seizure of Mr. Smith. The facts here in no way support an argument that this was a brief stop to question Mr. Smith. The facts are that the deputies had no reasonable articulable suspicion that crime was afoot when Mr. Smith stood near his home at the back of his driveway and declined to speak to the deputy and retreated into the safety of his home. Furthermore, the deputies did not briefly stop Mr. Smith. They forcibly entered his home, threatened him with a Taser, and handcuffed him.

Nonetheless, even if the applicable standard to detain Mr. Smith was reasonable articulable suspicion, which Plaintiff contends is not the standard, the deputies did not have reasonable articulable suspicion that Mr. Smith was about to commit a crime to justify briefly stopping him.

In this case, the cumulative information of specific and articulable facts available to the officers made it abundantly clear that Mr. Smith was not the burglary suspect. The details of the differences between the suspect's description and Mr. Smith have been set forth. Moreover, Deputy Moniz testified that when he saw Mr. Smith, he was not close to the description provided. (Moniz Dep. pp. 77-78; Exhibit 9). Further, during his deposition, Plaintiff's counsel had the following exchange with Deputy Moniz:

> Attorney Cooper: "And so once you were able to . . . observe him in detail, you could tell that Mr. Smith did not match the description of the person for whom you're looking for the burglary?"
>
> Deputy Moniz: "That is correct."

26

Attorney Cooper: "And as you said, it wasn't close?"

Deputy Moniz: "That is correct."

Additionally, officers should have known that the suspect was likely homeless, because he had a blanket, clothing, and other belongings with him in a Rubbermaid container that he left behind at Ms. Foggy's home. (Wieder Dep. pp. 63-64; Exhibit 12). In contrast, the deputies knew that Mr. Smith lived in the home. (Jacko Dep. p. 56; Exhibit 2). Nevertheless, Defendants pointed a Taser at Plaintiff, handcuffed him, and removed him from the safety and security of his home to the street. (Jacko Dep. p. 62-64; Exhibit 2).

Defendants did not have reasonable suspicion or probable cause to believe Plaintiff was the burglary suspect. As such, any degree of seizure of Plaintiff was objectively unreasonable. Handcuffing Plaintiff in his home and in front of his wife, children, and mother-in-law, and the subsequent forcible removal of Plaintiff from his house violated Plaintiff's Fourth Amendment right to be free from unreasonable seizure. The deputies acted without probable cause to believe that Mr. Smith had committed a crime. Instead they acted merely on "inarticulate hunches" (hunches that were unreasonable at that), which clearly violated his Fourth Amendment right against unreasonable seizure. *See Michigan v. Summers*, 452 U.S. at 696; *United States v. Watson*, 703 F.3d at 689.

In sum, Mr. Smith's right to be free from unreasonable seizures was clearly established at the time of the deputies' conduct and "the allegations underlying the claim, if true, substantiate a violation of a federal statutory or constitutional right". *See Ridpath*, 447 F.3d at 306. Defendants are not entitled to qualified immunity.

## C.    <u>Defendants Violated Mr. Smith's Clearly Established Right to be Free from Excessive Force.</u>

27

The right of a citizen to be free from excessive force has been clearly established and Defendants are not entitled to qualified immunity. The Supreme Court holds that claims of excessive force during an arrest, investigatory stop, or other seizure are evaluated under a Fourth Amendment objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness standard.'"). The *Graham* Court set out three factors to evaluate an officer's use of force: 1) "the severity of the crime at issue;" 2)" whether the suspect poses an immediate threat to the safety of the officers or others;" and 3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

In looking at the first *Graham* factor, the use of *any* force to effectuate an illegal arrest is unreasonable. As a starting point, Mr. Smith did nothing illegal and as such there was no crime at issue with respect to Plaintiff. (Jacko Dep. p. 75, ll. 3-14; Exhibit 2). "A citizen is not, of course, required to submit to an illegal arrest and may use as much force as is reasonably necessary to prevent an unlawful arrest." *State v. DeBerry*, 250 S.C. 314, 320, 157 S.E.2d 637, 640 (1967). In the State of South Carolina, resisting an unlawful arrest is not illegal but rather a protected act. *See, e.g., State v. Bethune*, 112 S.C. 100, 99 S.E. 753 (1919); *State v. Robertson*, 191 S.C. 509, 5. S.E.2d 285 (1939); *State v. Poinsett*, 250 S.C. 293, 157 S.E.2d 570 (1967); *State v. McGowan*, 347 S.C. 618, 557 S.E.2d 657 (2001). Because Defendants did not probable cause, or even reasonable articulable suspicion, to believe Plaintiff was the burglary suspect, any use of force to seize him was unreasonable and, therefore, unconstitutional.

Furthermore, Mr. Smith did not pose an immediate risk to the safety of law enforcement or any of the members of his family that were standing nearby. First, law enforcement had no

reasonable basis to enter the home.  Second, once in the home, the deputies had no reasonable basis that Mr. Smith was a danger to any person whatsoever, and, third, they could see that Mr. Smith was not the suspect they were looking for.  Mr. Smith did not want Deputy Jacko to handcuff him in his residence and was passively resisting by holding his hands down by his sides.  (Jacko Dep. p. 62, ll. 2-22; Exhibit 2).  Nevertheless, Deputy Wiedemann pointed his Taser at Plaintiff when Deputy Jacko was handcuffing him, and threatened, "Don't move or you're going to be Tased."  (Jacko Dep. pp. 61-62; Exhibit 2).  During Deputy Jacko's deposition, he admitted the use of excessive force:

> Attorney Cooper:  At the time that Taser was drawn, he was passively resistant?
>
> Deputy Jacko:  To me, yes.
>
> Attorney Cooper:  Is passive resistance a justification for use of force of a Taser?
>
> Deputy Jacko:  No.  They have to be actively trying to fight.
>
> Attorney Cooper:  At which time Akiliou Smith was not?
>
> Deputy Jacko:  No.
>
> Attorney Cooper:  So what I'm saying is, the use of Taser in that situation was an excessive use of force?
>
> Deputy Jacko:  Yes.

(Jacko Dep. p. 63, ll. 5-17; Exhibit 2).

The pointing of the Taser, a weapon, is excessive force when Mr. Smith was unarmed and not actively resisting.  *See Amuels v. Nutter*, No. 15-665, 2016 WL 1572933, at * 2-3 (E.D.Va. April 18, 2016) (Noting Fourth Amendment Excessive Force Claim based on the pointing of a firearm may be viable under some circumstances); *see also Gunsay v. Mozayeni*, No. 16-1131, 2017 WL 2684015, at * 4-5 (4th Cir. June 21, 2017) (Discussing excessive force involving the pointing of a firearm); *Cook v. Holmes*, No. 16-17, 2016 WL 6561458, at * 4 (W.D.Va. Nov.3, 2016); *Robinson v Solano County*, 278 F.3d 1007, 1015 (9th Cir. 2002) (Finding that pointing a

29

gun at the head of an apparently unarmed man was actionable as excessive force under the facts of that case); *Bellotte v. Edwards*, No. 08-94, 2009 WL 10675028 at * 5 (N.D.W.Va. Feb. 2, 2009). Thus, it is indisputable that pointing the Taser at Mr. Smith was excessive force.

In analyzing the third prong of the *Graham* test, Defendants attempt to convince this Honorable Court that Plaintiff's constitutionally protected action – retreating from the curtilage into the safety of the interior of his home – is somehow criminal or suspicious flight that creates an exigent circumstance to enter his home without a warrant. However, "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961) (citing *Entick v. Carrington*, 19 Howell's State Trials 1029, 1066; *Boyd v. United States*, 116 U.S. 616, 626 (1886)).

At the time Deputy Lindsay called out to Mr. Smith, Defendant had no reasonable articulable suspicion or basis to stop or seize him as described above. As such, "the citizen encountered in this manner has the 'right to ignore his interrogator and walk away'":

> Any person, including a policeman, is at liberty to avoid a person he considers dangerous. If and when a policeman has a right instead to disarm such a person for his own protection, he must first have a right not to avoid him but to be in his presence. That right must be more than the liberty (again, possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away; he certainly need not submit to a frisk for the questioner's protection.

*U.S. v. Burton*, 228 F.3d 524, 527 (4th Cir. 2000) (quoting *Terry*, 392 U.S. at 32-33 (J. Harlan, concurring)). It is indisputable that Mr. Smith did not flee from police and, rather, sought the safety of his home and called 9-1-1 to alert the police of a perceived threat outside his home. Mr. Smith also had the right not to speak to the deputy.

At the time Defendants seized Mr. Smith, he had done nothing criminal or illegal, there was no reasonable suspicion to stop and detain him, he was not actively resisting, and he did not pose a risk to any person.  Mr. Smith's right to be free from unreasonable seizure and use of excessive force was clearly established at the time of the deputies' conduct and "the allegations underlying the claim, if true, substantiate a violation of a federal statutory or constitutional right".  *See Ridpath*, 447 F.3d at 306.  Defendants are not entitled to qualified immunity.

.

## II.     DEFENDANT CHARLESTON COUNTY SHERIFF'S OFFICE IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S STATE LAW CAUSES OF ACTION.

The Charleston County Sheriff's Office motion for summary judgment on Plaintiff's common law tort claim for false imprisonment must be denied, because there are genuine issues of material fact to be resolved by the jury.

The tort of false imprisonment mirrors closely Plaintiff's claim for false arrest actionable pursuant to 42 U.S.C. § 1983.  The tort of false imprisonment protects the right to be free from any unlawful restraint on movement.  *Thompson v. Smith* 289 S.C. 334, 337, 345 S.E.2d 500, 502 (Ct. App. 1986).  To establish a claim for false imprisonment, the plaintiff must show: 1) the defendant restrained plaintiff; 2) the restraint was intentional; and 3) the restraint was unlawful.  *Thomas v. Colonial Stores*, 236 S.C. 95, 113 S.E.2d 337 (1960).  The only issue in this case is whether the restraint by Defendants upon Plaintiff was unlawful.  The facts are fully set forth above demonstrating Defendants did not have probable cause, or even reasonable articulable suspicion, to seize Plaintiff.

Defendants' motion for summary judgment with regard to Plaintiff's claims for Trespass and Negligence/ Gross Negligence must be denied.  A Trespass is an interference with a person's

right of quiet and exclusive possession of property. *Lane v. Mimms*, 221 S.C. 236, 70 S.E.2d 244 (1952). Plaintiff's action for violation of his Fourth Amendment right to be free from unreasonable search and seizure against the unlawful entry into his home sets out the basis for Plaintiff's claim for Trespass. Defendants intentionally kicked in Plaintiff's door and invaded the sanctity of his home. As such, summary judgment must be denied as to Plaintiff's common law claim for Trespass.

Defendant's claim that Plaintiff makes no allegation of gross negligence is unfounded and incorrect. Plaintiff's Complaint alleges in paragraph 62: "Defendants breached such duties and the injuries and harm to Plaintiff were the direct, foreseeable, and proximate cause of the negligent are careless, and willful, wanton, and reckless, and grossly negligent acts/ omission of Defendants as described herein above." (Dk. No. 1). The South Carolina courts have well defined gross negligence. Gross negligence is the "the failure to exercise slight care." *Doe v. Greenville Cty. Sch. Dist.*, 375 S.C. 63, 71, (S.C. 2007) (quoting *Steinke v. South Carolina Dep't of Labor, Licensing and Regulation,* 336 S.C. 373, 395 (S.C. 1999)). It "is a relative term, and means the absence of care that is necessary under the circumstances." *Id.* Gross negligence is ordinarily a mixed question of law and fact that "in most cases . . . is a factually controlled concept whose determination best results with the jury." *Faile v. South Carolina Dept. of Juvenile Justice*, 350 S.C. 315, 332 (S.C. 2002). Plaintiff fully anticipates the jury will find the actions and facts set forth above demonstrate Defendants failed to exercise even the slightest care. There is a genuine issue of material fact as to whether Defendants were grossly negligent in their actions and summary judgment on the issue must be denied.

As to Defendants claim of immunity for exercise of discretion pursuant to S.C. Code § 15-78-60(5), Defendants failed to plead this affirmative defense and as such it is waived. (Dk. No.

32

12).  Nevertheless, these officers did not exercise discretion as contemplated by S.C. Code 16-78-60(5) and are not entitled to summary judgment on that issue.  In the present case, the officers were performing their law enforcement function to apprehend those who violate the law like *Clark v. South Carolina Dept. of Public Safety*, 363 S.C. 377, 386-87 (S.C. 2005).  The Supreme Court ruled "that a law enforcement officer is not immune from liability under section 15-78-60(5) for the decision on whether to begin or continue the immediate pursuit of a suspect."  *Id*. at 387, 608 S.E.2d at 579.  In this case, Defendants were purportedly pursuing who they believed was the burglary suspect.  This is not an act of discretion afforded protection under the South Carolina Tort Claims Act.

Defendants next attempt to assert S.C. Code § 15-78-60(2), even though this affirmative defense was not plead and as such it is waived.  (Dk. No. 12).  Nevertheless, Defendants' argument is that Plaintiff was contributorily negligent alleging, "but for Plaintiff's furtive movements and refusal to respond to deputies' requests to open the door, no entry would have been made."  (Dk. No. 60-1).  This code section does not transform contributory negligence by the plaintiff into an absolute immunity defense.  *See, e.g., Smith v. Regional Medical Center of Orangeburg*, 713 S.E.2d 656 (S.C. Ct. App. 2011) (stating government hospital not liable for negligence of independent contractor).  However, as fully set forth above, Plaintiff had no obligation to open the door to Defendants request.  Additionally, Plaintiff denies "furtive" movements and asserts his right to seek the safety of his home from an unknown person.  *Supra*.

## CONCLUSION

Based on all the foregoing reasons, Defendants are not entitled to summary judgment, and Plaintiff respectfully requests that the motion be DENIED it its entirety.

33

Respectfully Submitted,

**McLeod Law Group, LLC**
3 Morris Street, Suite A
P.O. Box 21624
Charleston, SC 29413
P: (843)277-6655 F: (843)277-6660


 /s/Michael Thomas Cooper
W. Mullins McLeod, Jr., No. 7142
Michael Thomas Cooper, No. 12198
Jacqueline LaPan Edgerton, No. 11710

*Attorneys for the Plaintiff*

This 1st day of June, 2018.
Charleston, South Carolina