UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| AKILIOU SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:16-655-BHH |
| | ) | |
| vs. | ) | |
| | ) | |
| JAMES L. JACKO, ZACH LINDSAY, | ) | **OPINION AND ORDER ON** |
| JOHN WIEDEMANN, and MATTHEW | ) | **QUALIFIED IMMUNITY** |
| WEAN, in their respective individual | ) | |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on the issue of qualified immunity. The jury trial in this case was completed on June 21, 2019. (ECF No. 120.) After the jury was excused, the Court directed the parties to submit, within seven days, briefs in support of their positions on qualified immunity. (*Id.*) Plaintiff Akiliou Smith ("Plaintiff" or "Smith") filed his memorandum in opposition to Defendants' motion for qualified immunity on June 28, 2019. (ECF No. 128). Defendants James L. Jacko ("Jacko"), Zach Lindsay ("Lindsay"), John Wiedemann ("Wiedemann"), and Matthew Wean ("Wean") (collectively "Defendants"), filed their memorandum in support of qualified immunity on the same day. (ECF No. 129.) Plaintiff filed a response to Defendants' memorandum on July 3, 2019. (ECF No. 130.) The issue is ripe for disposition and the Court now issues the following ruling.

**BACKGROUND AND SUMMARY OF TRIAL EVIDENCE**

In this damages action brought pursuant to 42 U.S.C. § 1983, Plaintiff alleged that

1

Defendants violated his rights under the Fourth Amendment to the U.S. Constitution to be free from the unreasonable search of his home, from the unreasonable seizure of his person, and from the use of excessive force. It is undisputed that Defendants possessed neither a warrant nor consent when Defendant Jacko kicked in the door of Plaintiff's home, entered along with Defendants Wean and Wiedemann, seized Plaintiff in the kitchen area, and removed him from the home in handcuffs. The testimonial, documentary, and electronic evidence at trial established the following facts.

On December 17, 2015, Ms. Angeline Foggy came home to her house on Ghana Street to find an unknown man sitting on her sofa watching television. By Ms. Foggy's description the man was African American, had an afro haircut of approximately one to two inches in length, was of slim build weighing approximately 150 pounds, stood approximately five foot five inches (5'5") tall, had a small amount of facial hair, and was wearing jeans and a jean jacket. She further estimated that the man was between twenty-five (25) and thirty (30) years old. Ms. Foggy called 911 and told the man—who gave his name as "Shawn Freeman"—to leave, which he did, walking directly past her while she stood on the porch near the doorway on the phone. Ms. Foggy gave her description of the intruder to the 911 operator and to the Sheriff's Deputies that eventually responded to her house. While Ms. Foggy was still on the phone with 911, now standing inside her doorway, the trespasser returned to her yard in an attempt to retrieve his belongings, which he had left inside the house in a plastic storage bin and a backpack. Ms. Foggy told him to leave her yard and he complied without having retrieved his belongings. More than thirty (30) minutes elapsed between the time Ms.

Foggy called 911 and the Sheriff's Deputies responded to her home. While the Deputies were responding to the scene, the 911 dispatcher gave a caution over the radio for a "Deshawn Freeman," a forty-one (41) year old black male who had a previous conviction for assault on a police officer. However, the dispatcher clarified that the name "Deshawn Freeman" was not a perfect match for the name provided by the intruder, "Shawn Freeman."

Ms. Foggy informed the Sheriff's Deputies that her laptop had been moved from its usual place on her bedside table to the living room. At some point, the Deputies discovered that the trespasser had gained access to Ms. Foggy's home by removing an air conditioning unit from the window. The 911 dispatch call was elevated from a trespass to a burglary because the Deputies deemed removal of the air conditioner to be an indication that the suspect may have intended to steal Ms. Foggy's belongings, such as her laptop, while inside the home.

At all times relevant to the case, Defendant Lindsay was a Sheriff's Deputy with Charleston County and a K-9 handler. On the night in question, Lindsay responded to Ms. Foggy's house with his K-9, Zeus, a German shepherd weighing approximately eighty (80) pounds. Lindsay was wearing green tactical BDU pants, a black shirt, and a black tactical vest with Velcro patches indicating he was a member of the Sheriff's Office. Zeus was also wearing a K-9 vest that had the word "Sheriff" on it. Lindsay testified that Ms. Foggy told her description of the trespass/burglary suspect to Defendant Jacko first, then Jacko relayed the information to Lindsay. After giving Zeus time to gain a scent to track, Lindsay set off into the neighborhood following Zeus who was pulling hard, which

showed that Zeus was not merely sniffing around but was following a scent. Zeus turned onto Kano street, on which Plaintiff's home is located.

When Zeus neared the end of Plaintiff's driveway, he lifted his head indicating an "air scent." The significance of the air scent meant only that Zeus detected a person in close vicinity, not that the scent he smelled in the air somehow matched the scent he had been tracking on the ground. In his trial testimony, Lindsay confirmed that Plaintiff was on his property for the duration of their interaction, and that Plaintiff did nothing illegal when Lindsay observed him. Lindsay further testified that when he first saw Plaintiff, he did not believe Plaintiff was posing a threat to anyone. Lindsay stated that he saw Plaintiff "lurch behind a vehicle" parked in the driveway, which caused Lindsay to shine a flashlight on the vehicle. It was dark on the evening in question, and multiple witnesses testified that the bulb in the street light at the end of the driveway was not functional.

For his part, Plaintiff disputed that he lunged behind the vehicle in the driveway. He was outside taking out the trash when someone at the end of the driveway pointed a flashlight at him and said, "Hey you, come here." Plaintiff stated that the tone of this verbal command, the fact that he did not recognize the individual, the fact that the individual had a large dog with him, and the fact that Plaintiff is "not too fond of dogs," caused him to run back into his house. In his report, Lindsay stated that he said, "Show me your hands," to Plaintiff in the driveway. Jacko, who was also on scene at the time, stated that Lindsay said, "Sheriff's Office, stop." At trial, Lindsay was not certain what he said because in high stress situations one often cannot remember exactly what was said.

4

Lindsay and Plaintiff offered conflicting testimony about whether Plaintiff struggled to enter the house when he ran to the door. Lindsay stated that from his perspective Plaintiff's entry was "a little bit abnormal," that he "jiggled the door handle," and it "appeared to be a struggle" for him to get into the house. These conclusions led Lindsay to have a "gut feeling" that "maybe [Plaintiff] doesn't know this residence or belong at this residence." Lindsay further testified that he "had no clue" if Plaintiff was the suspect from Ms. Foggy's house or not, which is why he "showed restraint and did not deploy [his] dog." For his part, Plaintiff denied that he had any trouble getting into his own house and stated that he did not fumble at the door.

The door in question opened directly into the home's kitchen. When Plaintiff reentered the house he locked the door, told his mother in law ("Ms. Davis")—who was sitting at the kitchen table with Plaintiff's wife ("Mrs. Smith") and children—that someone was chasing him with a dog, and followed her advice to call 911 and report the situation. The substance of Plaintiff's 911 call corroborates that he was not initially aware that the individual in the driveway with a dog was a law enforcement officer. Plaintiff began relaying Mrs. Smith's observations of the individuals outside the door to the 911 operator, such as, "They got guns and stuff." Plaintiff testified that when the Sheriff's Deputies ultimately entered the house and he realized they were law enforcement officers, he was confused, "When they said I needed to go outside, I didn't even know why they wanted me outside."

Defendant Lindsay testified that when he followed Plaintiff and ran up to the door he heard yelling and screaming from inside the residence *before* he pounded on the

door. He denied using any profanity when trying to gain entry into the home. Ms. Davis and Mrs. Smith both testified that no one was screaming or yelling in the kitchen until an unidentified individual began pounding on the door and shouting, "Open the fucking door." They stated that the children began crying when the pounding began. Ms. Davis and Mrs. Smith further testified that when Ms. Davis asked the individuals who they were, they responded, "This is the fucking police!" Defendants repeatedly denied this assertion, stating that as Sheriff's Deputies they would never refer to themselves as "the police." Ms. Davis testified that she responded to the Deputies' demand that she open the door by saying, "I have my kids in here." Ms. Davis further testified that one of the individuals on the other side of the door said, "You have a fugitive in your house," to which she responded, "He's not a fugitive, he's my son in law."

Defendant Lindsay was the first Sheriff's Deputy to attempt to force entry into the home, but was unsuccessful because he had Zeus with him on the stoop. Defendant Jacko joined Lindsay at the door and Lindsay told Jacko to kick the door in. After two unsuccessful front-kicks, Jacko successfully back-kicked the door in, forcing the lock through the wood of the doorframe. Whereupon Jacko, knocked off balance by his kick, fell off the stoop, collided with Zeus, was bitten by Zeus, drew his service weapon, then holstered the weapon when he saw women and children sitting at the kitchen table.

Lindsay stayed outside the home with Zeus while Jacko entered the dwelling, followed shortly thereafter by Defendants Wean and Wiedemann. Once in the home, Jacko never asked Ms. Davis, Mrs. Smith, or the children seated at the kitchen table whether they were safe. When Ms. Davis and Mrs. Smith confronted Jacko about his

unauthorized entry into the house, he stated, "We need to speak to him and see him," referring to Plaintiff. Jacko acknowledged, in his testimony, that no one in the kitchen appeared to be in physical danger. Walking through the kitchen, Jacko encountered Plaintiff in a hallway where the kitchen and living room meet. Asked what conclusions he drew upon observing Plaintiff up close, Jacko responded, "I didn't have any immediate conclusion at that time. I just knew that a man may have forced entry into the home." Plaintiff, who is five foot and seven inches (5'7") in height, and weighed 220 pounds, was wearing his Atlantic Pest Control uniform, consisting of khaki cargo pants, a green company polo shirt, and a green company jacket bearing the Atlantic Pest Control emblem. He was clean shaven due to a company policy that did not allow facial hair, and his hair was closely cut also due to company requirements. None of the Deputies that entered the home asked Plaintiff for his name or identification, but simply told him that he needed to come outside.

Jacko attempted to seize Plaintiff and place him in handcuffs. Plaintiff repeatedly questioned the Sheriff's Deputies why he was being detained and why they were requiring him to leave the dwelling rather than talking to him inside the home. Jacko initially had trouble getting the handcuffs on Plaintiff, but the extent of Plaintiff's resistance was to pull his hand away and put his arms at his sides when Jacko grabbed his hand. Wean helped Jacko get one of Plaintiff's hands into the handcuffs. Wiedemann never touched Plaintiff, but drew his taser and held it at the "low ready" position in order to gain Plaintiff's compliance with Jacko's efforts to handcuff him. At one point, Wiedemann pointed the taser at Plaintiff and told him that he needed to comply and

come outside the home, which Plaintiff ultimately did. Mrs. Smith testified that when she verbally objected to Defendants' actions toward her husband, Wiedemann responded, "Shut up or I'll tase you too." Wiedemann denied making any such statement.

Once Plaintiff was standing in his driveway in handcuffs, Deputy Wean drove around the corner to Ms. Foggy's house and brought her to Plaintiff's driveway in order to identify him as the suspect from the trespass/burglary. Ms. Foggy testified that one of the Deputies shined a light on Plaintiff, at which point she told them that Plaintiff was not the trespass/burglary suspect. When asked at trial whether Plaintiff "looked the same" as the suspect, Ms. Foggy responded, "no." When asked if Plaintiff even looked close to the suspect in appearance, Ms. Foggy responded, "no." Plaintiff testified that from his vantage point in the driveway he observed Ms. Foggy shake her head inside Defendant Wean's Sheriff's vehicle, but that the Deputies did not take the handcuffs off of him at that time. Defendants first ran a search on Plaintiff through the National Crime Information Center to determine whether he had any outstanding warrants prior to releasing him.

Deputy Brian Moniz ("Moniz") was working the same squad as the named Defendants on the evening in question. He responded to Ms. Foggy's house and received her description of the suspect. When Lindsay was on the stoop of Plaintiff's home and Jacko breached the door, Moniz was about twenty (20) yards away, maintaining a perimeter in the front yard. Moniz observed Plaintiff when he was removed from the home and escorted to the driveway in handcuffs. Moniz testified that when Plaintiff walked out of the door into the porch light he was able to see that Plaintiff was

"not close" to the weight given in the description of the trespass/burglary suspect.

At the conclusion of trial, the Court instructed the jury on the law, including the following charge regarding exigent circumstances:

> It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable subject to certain exceptions. The presence of exigent circumstances is one such exception to the warrant requirement.
>
> In determining whether an exigency existed when the search commenced, you must determine whether the circumstances would cause law enforcement officers to form an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within.
>
> For law enforcement officers to successfully assert the exigent circumstances doctrine, they must possess a reasonable suspicion that such circumstances exist at the time of the search or seizure in question. Exigent circumstances vary from case to case, and a determination of the issue is of necessity fact-specific. Examples of such exigencies might include, but are not limited to, risk of danger to law enforcement or to other persons inside or outside a dwelling. When policemen, firemen, or other public officers are confronted with evidence which would lead a prudent and reasonable official to see a need to act to protect life or property, they are authorized to act on that information, even if ultimately found erroneous. This version of exigent circumstances is called the "emergency doctrine."
>
> For exigent circumstances to have existed to justify the Defendants' warrantless entry into the home under the emergency doctrine, the defendants must have had an objectively reasonable belief that an emergency existed inside the home that required immediate entry to render assistance or prevent harm to persons or property within. The defendants bear the burden of demonstrating the existence of such exigent circumstances. This "emergency exigency" exception to the warrant requirement justifies entry as part of the service and protective functions of the police as opposed to their law enforcement functions.
>
> In order for exigent circumstances to justify a warrantless entry of a home, the conduct of law enforcement preceding the exigency must be reasonable in the same sense. Therefore, the exigent circumstances exception applies when law enforcement does not gain entry to the premises by means of an actual or threatened violation of the Fourth Amendment. This means that if law enforcement creates the exigency by engaging in or threatening to engage in conduct that violates the Fourth Amendment, the forced entry of the home that follows is unconstitutional.

After due deliberation, the jury found that Defendants Jacko and Lindsay violated Plaintiff's right to be free from unreasonable searches under the Fourth Amendment. (ECF No. 122 at 1.) The jury further found that Defendants Jacko, Wiedemann, and Wean violated Plaintiff's right to be free from unreasonable seizure under the Fourth Amendment. (*Id.* at 2.) Thereafter, the Court posed the following special interrogatory to the jury regarding Defendants Jacko and Lindsay: "Based on what he knew at the time, did Deputy [Jacko/Lindsay] have an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within Plaintiff Akiliou Smith's house?" (ECF No. 122-1 at 1–2.) The jury responded, "No," with respect to both Defendants Jacko and Lindsay. (*Id.*) The Court posed the following special interrogatory to the jury regarding Defendants Jacko and Wean: "Based on what he knew at the time that he entered the residence, did Deputy [Jacko/Wean] have an objectively reasonable belief that he had probable cause to arrest Plaintiff Akiliou Smith?" (*Id.*) The jury responded, "No," with respect to both Defendants Jacko and Wean. (*Id.*) Finally, the Court posed a slightly different special interrogatory to the jury regarding Defendant Wiedemann: "Based on what he knew at the time, did Deputy John Wiedemann have an objectively reasonable belief that he possessed probable cause to assist the other Deputies in seizing Plaintiff Akiliou Smith?" (*Id.* at 2.) The jury responded, "Yes," with respect to Defendant Wiedemann. (*Id.*)

## **LEGAL STANDARD**

The doctrine of qualified immunity protects government officials performing discretionary functions from civil damage suits so long as the conduct in question does

not "violate clearly established rights of which a reasonable person would have known."

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). If the constitutional right of a § 1983 plaintiff was clearly established at the time of the alleged violation, such that an objectively reasonable official in the defendant's position would have known of the right, that official is not entitled to immunity. *See id.* Conversely, "If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Id.*

> The [qualified immunity] doctrine is intended to "balance[ ] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L.Ed.2d 565 (2009)). It "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 5, 134 S. Ct. 3, 187 L.Ed.2d 341 (2013) (internal quotation marks and citation omitted).

*Hupp v. Cook*, No. 18-1845, 2019 WL 3330443, at *3 (4th Cir. July 25, 2019).

In determining whether qualified immunity applies, the Court must determine: (1) whether Plaintiff has alleged the deprivation of an actual constitutional right; and, (2) whether that right was clearly established at the time of the alleged violation. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). Moreover, "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action[,] assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citing *Harlow*, 457 U.S. at 818–19). "The burden of proof and

persuasion with respect to a claim of qualified immunity is on the defendant official."
*Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003) (citing *Gomez v. Toledo*, 446 U.S. 635, 640–41 (1980)).

The legal determination of whether the right in question was "clearly established," depends in substantial part on the level of generality at which the relevant legal rule is conceived. *See Anderson*, 483 U.S. at 639. The U.S. Supreme Court has discussed this question of generality versus particularity in the following manner:

> For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." *Davis*, *supra*, 468 U.S., at 195, 104 S. Ct., at 3019. It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: **The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful**, *see Mitchell*, *supra*, 472 U.S., at 535, n.12, 105 S. Ct., at 2820, n.12; **but it is to say that in the light of pre-existing law the unlawfulness must be apparent**. *See, e.g.*, *Malley*, *supra*, 475 U.S., at 344–345, 106 S. Ct., at 1097–1098; *Mitchell*, *supra*, 472 U.S., at 528, 105 S. Ct., at 2816; *Davis*, *supra*, 468 U.S. at 191, 195, 104 S. Ct., at 3017, 3019.

*Anderson*, 483 U.S. at 639–40 (emphasis added). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *United States v. Lanier*, 520 U.S. 259, 271 (1997) (quoting *Anderson*, 483 U.S. at 640).[1] Moreover, the Fourth Circuit Court of Appeals has stated, "the nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent the denial of qualified immunity." *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999) (citing *Jean v. Collins*, 155 F.3d 701, 708 (4th Cir. 1998) (en banc)).

## DISCUSSION

The Court notes, and Defendants concede (*see* ECF No. 129 at 1), that the jury, through its verdict, has already determined the first prong of the qualified immunity analysis. Specifically, the jury determined that Defendants Jacko and Lindsay violated Plaintiff's right to be free from unreasonable searches under the Fourth Amendment, and that Defendants Jacko, Wiedemann, and Wean violated Plaintiff's right to be free from unreasonable seizure under the Fourth Amendment. (*See* ECF No. 122.) The remaining question for the Court's determination is whether the rights Defendants were found to have violated were clearly established at the time of the constitutional violations. *See*

---

[1] In *Hope v. Pelzer*, 536 U.S. 730 (2002), the Supreme Court expounded upon the phenomenon of general statements of law serving as the basis for "clearly established" rights for purposes of qualified immunity analysis, stating: "Our opinion in *Lanier* thus makes clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in *Lanier*, we expressly rejected a requirement that previous cases be 'fundamentally similar.' Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with 'materially similar' facts." *Id.* at 741.

*Wilson*, 526 U.S. at 609.

The presumptive unconstitutionality of law enforcement entering a private home without a warrant is clearly established. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). "No reasonable officer could claim to be unaware of the basic rule, well established by [Supreme Court] cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional." *Groh*, 540 U.S. at 564. The Supreme Court has discussed various exigencies that constitute exceptions to the warrant requirement as follows:

> [B]ecause the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions. *Flippo v. West Virginia,* 528 U.S. 11, 13, 120 S. Ct. 7, 145 L.Ed.2d 16 (1999) *(per curiam); Katz v. United States,* 389 U.S. 347, 357, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967). We have held, for example, that law enforcement officers may make a warrantless entry onto private property to fight a fire and investigate its cause, *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S. Ct. 1942, 56 L.Ed.2d 486 (1978), to prevent the imminent destruction of evidence, *Ker v. California,* 374 U.S. 23, 40, 83 S. Ct. 1623, 10 L.Ed.2d 726 (1963) (plurality opinion), or to engage in "'hot pursuit'" of a fleeing suspect, *United States v. Santana,* 427 U.S. 38, 42, 43, 96 S. Ct. 2406, 49 L.Ed.2d 300 (1976). "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona,* 437 U.S. 385, 393–394, 98 S. Ct. 2408, 57 L.Ed.2d 290 (1978).
>
> One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. "'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" *Id.,* at 392, 98 S. Ct. 2408 (quoting *Wayne v. United States,* 318 F.2d 205, 212 (C.A.D.C.1963) (Burger, J.)); *see also Tyler, supra,* at 509, 98 S. Ct. 1942. Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury. *Mincey, supra,* at 392, 98 S. Ct. 2408; *see also Georgia v. Randolph, ante,* at 118, 126 S. Ct. 1515, 1525, 164 L.Ed.2d 208 ("[I]t would be silly to suggest that the police would commit a tort by entering . . . to determine whether violence (or threat of violence) has just

occurred or is about to (or soon will) occur").

*Brigham City*, 547 U.S. at 403–04. The exigent circumstance invoked by Defendants in this case was the "emergency doctrine." "This particular exigency is expressed as one of reasonably perceived 'emergency' requiring immediate entry as an incident to the service and protective functions of the police as opposed to, or as a complement to, their law enforcement functions." *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992), *as amended* (May 21, 1992). In the Fourth Circuit, to successfully invoke this doctrine as an exception to the warrant requirement "the person making entry must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within." *Id.* (citations omitted).

In the instant case, there was no fire to be fought, there was no risk of destruction of evidence, and Defendants were not engaged in "hot pursuit" of a fleeing suspect.[2] The Court finds that the evidence at trial did not support an objectively reasonable belief on the part of Defendants that an emergency existed requiring immediate entry into Plaintiff's home to render assistance or prevent harm to persons or property within. Said another way, no reasonable officer in Defendants' position and equipped with the same information possessed by Defendants would conclude that such an emergency existed. This finding is substantiated by the jury's verdict on the unreasonable search claim, and responses to the special interrogatories relevant to that claim. (*See* ECF Nos. 122 & 122-1.) The Sheriff's Deputies did not arrive to the neighborhood to investigate Ms.

---

[2] In a pretrial motions hearing, Defendants conceded that the "hot pursuit" doctrine was not applicable to the facts of the case and confirmed that they were not raising a "hot pursuit" theory to substantiate an exception to the warrant requirement. (*See* Defs.' Resp. in Opp'n to Pl.'s Mot. to Exclude Certain Test. of Expert Don L. Wieder, ECF No. 103 at 1–2 ("[D]efendants do not claim that they entered the plaintiff's residence subject to the 'hot pursuit' exception to the warrant requirement.").)

Foggy's allegations of a trespasser/burglar until more than thirty (30) minutes after she called 911. During that time, the trespasser/burglar walked directly past Ms. Foggy standing on the porch of her home without any threat of violence or indication of intent to destroy property. The trespasser/burglar subsequently returned to Ms. Foggy's yard while she was still on the phone with 911 in an effort to retrieve his belongings. He did not threaten Ms. Foggy in any way during this subsequent interaction, and when Ms. Foggy told him to leave her yard he complied without having retrieved his belongings and without further incident. There was no allegation that the suspect from Ms. Foggy's home was armed.

Defendant Lindsay's observations of Plaintiff outside his home were insufficient to support reasonable suspicion as to the presence of exigent circumstances. Given the context that Plaintiff's build, weight, clothing, lack of facial hair, and haircut did not match the trespass/burglary suspect from the home intrusion at Ms. Foggy's, any reasonable official in Defendants' position would understand that kicking in the door of a private dwelling without a warrant in order to pursue an individual that had done nothing wrong and merely retreated from his driveway into the privacy of his home violates the rights guaranteed by the Fourth Amendment. The discrepancy of seventy (70) pounds between the suspect's described weight and Plaintiff's actual weight would register to a reasonable officer not simply as the result of an inapt description by Ms. Foggy, but as a factor tending to *exclude* Plaintiff from consideration as a suspect. Indeed, the Court is hard pressed to find any facts other than Plaintiff's race and gender,[3] articulated by

_____

[3] An argument can be made that Plaintiff's height—5'7"—also reasonably matched Ms. Foggy's description of the suspect—5'5"—but one can draw opposing conclusions from the nature of this discrepancy— namely, that it exemplifies reasonable proximity or constitutes identifiable difference with regard to height.

Defendants, that could have led them to believe that Plaintiff was the home intrusion suspect. These facts were clearly not enough to justify warrantless entry into the home. If a man cannot run from one area of his property into his home without risking a forceful breach of the door so that police can allay their concern that he *might* be up to no good, then the protections of the Fourth Amendment mean little enough.

Moreover, Defendants failed to articulate reasonable suspicion to support the presence of an emergency justifying warrantless entry to prevent harm to persons or property. The greater weight of evidence at trial—namely, Ms. Davis and Mrs. Smith's testimony—supported the notion that there was no yelling and screaming inside the house prior to Defendant Lindsay pounding on the door and ordering that it be opened. But even if one were to adopt Lindsay's assertion that he heard yelling and screaming inside the kitchen *before* he began pounding on the door, it would not constitute reasonable suspicion of circumstances implicating the emergency doctrine. Warrantless intrusion into a private dwelling must be justified by a strong government interest in preserving life and/or preventing serious harm. It is simply insufficient for law enforcement officers to cite uncertainty about the conditions inside a home as the evidentiary predicate necessary to substantiate the emergency exception to the warrant requirement. General appeals to concern for occupants' safety do not constitute specific, articulable facts demonstrating the need for assistance or the presence of an imminent threat of harm. This is to say nothing of the fact that it would be equally reasonable for an officer in Defendant Lindsay's position to conclude that any commotion in the kitchen was the result of a household member unexpectedly running back inside, at night,

scared by an individual in the driveway with a large dog who was demanding compliance with orders. One would need to indulge any number of assumptions to get from the detection of a commotion inside a dwelling, to the conclusion that emergency assistance or harm prevention was required. The evidence presented at trial did not bear the weight of those assumptions.

Furthermore, Defendants' actual behavior after kicking in the door of Plaintiff's home is strikingly incongruous with their invocation of the emergency doctrine. When the door swung open, Defendant Jacko immediately saw Ms. Davis, Mrs. Smith, and the children sitting at the kitchen table, yet he never asked them whether they were in distress or whether Plaintiff was an intruder before barging into the home. In fact, Ms. Davis and Mrs. Smith were openly objecting to the Deputies' entry, a fact which Defendants appear to have completely ignored. When he encountered Plaintiff in the hallway, Defendant Jacko failed to ask Plaintiff for his name or identification prior to seizing him, basic investigative procedure which could have immediately eliminated Plaintiff as a suspect and curtailed the scope of the search. In short, Defendants actions in breaching the door and entering the home were objectively unreasonable.

Finally, Defendants failed to present sufficient evidence at trial to support probable cause to arrest Plaintiff once they had unconstitutionally breached the door of his home. The "general right to be free from an unlawful arrest is of course clearly established-under the [F]ourth [A]mendment, police officers must have probable cause before they arrest a suspect." *Ferguson v. Taylor*, 933 F.2d 1001, *2 (4th Cir. 1991). "Probable cause exists where 'the facts and circumstances within [the officers'] knowledge and of which

they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)).

> "Probable cause is determined by a 'totality-of-the-circumstances' approach." *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017) (citing *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). The inquiry "turns on two factors: 'the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct.'" *Id.* (quoting *Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016)). While [the Court] look[s] to the information available to the officer on the scene at the time, [it] appl[ies] an objective test to determine whether a reasonably prudent officer with that information would have thought that probable cause existed for the arrest. *Graham*, 831 F.3d at 185. Evidence sufficient to secure a conviction is not required, but probable cause exists only if there is sufficient evidence on which a reasonable officer at the time could have believed that probable cause existed for the arrest. *Wong Sun v. United States*, 371 U.S. 471, 479, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963).

*Hupp v. Cook*, No. 18-1845, 2019 WL 3330443, at *4 (4th Cir. July 25, 2019). In the context of a qualified immunity inquiry, the objective reasonableness standard applies and the ultimate question is not whether the defendant officers "actually had probable cause, but only 'whether a reasonably well-trained officer in [the defendants'] position would have known'" that he lacked probable cause. *Ferguson*, 933 F.2d 1001 at *2 (quoting *Malley v. Briggs,* 475 U.S. 335, 345 (1986)). The Court finds that the answer to this question is plainly that no reasonable officer would have believed that the facts and circumstances within Defendants' knowledge were sufficient to warrant the belief that Plaintiff had been or was committing a crime. Thus, Defendants Jacko, Wean, and Wiedemann's conduct was objectively unreasonable in seizing Plaintiff, using a drawn

taser to compel his compliance, pointing a taser at him and indicating an intent to deploy it if he did not come outside, handcuffing him, and removing him from his home. This finding is substantiated by the jury's verdict on the unreasonable seizure claim, and responses to the special interrogatories relevant to that claim. (*See* ECF Nos. 122 & 122-1.)[4]

It should first be noted that the unconstitutionality of the warrantless search that gave Defendants access to Plaintiff's home renders any subsequent, warrantless seizure occurring inside the home unconstitutional in the first instance. But even an independent analysis of the seizure reveals that a reasonably well-trained officer in Defendant Jacko's position would have known that he lacked probable cause to arrest Plaintiff because Plaintiff's build, bodyweight, facial hair, haircut, and clothing were all notably different than Ms. Foggy's description of the trespass/burglary suspect. Once armed with knowledge of Plaintiff's features and appearance, a reasonable officer would have excluded Plaintiff from consideration as a suspect. Moreover, a reasonable officer would not have considered Plaintiff's actions outside the home as sufficient to support the

---

[4] It is of no material import that the jury answered the special interrogatory posed regarding Defendant Wiedemann in the affirmative, thereby indicating their consensus that he had "an objectively reasonable belief that he possessed probable cause to **assist** the other Deputies in seizing [Plaintiff]." (*See* ECF No. 122-1 at 2 (emphasis added).) The Court posed this interrogatory with slightly different wording than the correlative interrogatories posed regarding Defendants Jacko and Wean in an attempt to avoid confusing the jury about Wiedemann's role in the seizure. Specifically, the Court intended to craft the question in a manner that reflected the state of the evidence, which was that Jacko and Wean laid hands on Plaintiff and placed him in handcuffs, while Wiedemann stood nearby with his taser drawn and never touched Plaintiff. In retrospect, the Court acknowledges that this different wording appears to have created more confusion than it alleviated. Ultimately, however, the Court's inartful drafting of one special interrogatory does not alter the plain fact that Wiedemann's actions were an integral part of a constellation of Deputy behavior that compelled Plaintiff's submission to the handcuffing and unwanted removal from his home. In other words, Wiedemann's conduct, as a legal matter, was no less culpable than the other Defendants in effectuating the unconstitutional arrest. Moreover, it is undisputed that Wiedemann had no *additional*, articulable information, above and beyond that possessed by Jacko and Wean, which would alter the probable cause and objective reasonableness inquiries as to Wiedemann individually. Accordingly, the Court has analyzed the qualified immunity question uniformly for all three Defendants found liable under the unreasonable seizure theory.

presence of probable cause.[5] Mere retreat into one's own residence, even after having

been hailed by law enforcement, does not render one subject to seizure, however brief.

Defendants Wean and Wiedemann, by their own testimony, had even less information

about Plaintiff's conduct than Defendants Lindsay and Jacko. Therefore, there is no

viable argument to be made that their actions in seizing Plaintiff were justified when

Jacko's actions were not. Accordingly, Defendants' conduct viz a viz the seizure was

objectively unreasonable, and they are not entitled to qualified immunity.

Defendants argue "that there is no precedent—much less a controlling case or

robust consensus of cases—finding a Fourth Amendment violation under the

circumstances encountered by the deputies in this case." (ECF No. 129 (citing *District of*

*Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018)[6].) But this argument misses the

point. It is, no doubt, a rare case indeed where law enforcement officers would kick in the

locked door of a private dwelling without a warrant and against the express wishes of the

---

[5] In their brief, Defendants argue that the Court's application, after due deliberation, of the probable cause standard, rather than the reasonable suspicion standard, to the factual scenario presented at trial demonstrates that the law was not clearly established as to the constitutionality of the seizure in question: "Defendants submit that the law on which standard applies under these circumstances was not so clearly established on December 7, 2015, that Defendants could have known that they needed more than reasonable suspicion and exigent circumstances to detain Plaintiff for eleven minutes before releasing him." (*See* ECF No. 129 at 4–9.) However, the Court notes that its findings with regard to qualified immunity as to the unreasonable seizure would be the same even if the Court had ruled that the seizure in question was an investigative detention, requiring reasonable suspicion, instead of an arrest, requiring probable cause. This is because the trial evidence was devoid of specific, articulable facts to justify the seizure under any standard. As more fully articulated above, the inferences that a reasonable officer would draw in light of his experience and the circumstances at issue would tend to exclude Plaintiff from consideration as the Ghana Street suspect, and would not support the presence of exigent circumstances. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968) ("[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."). Accordingly, Defendants' conduct was objectively unreasonable under either a reasonable suspicion or a probable cause rubric.

[6] In *Wesby*, the Supreme Court stated: "While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular arrest beyond debate. Of course, there can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances. But a body of relevant case law is usually necessary to clearly establish the answer with respect to probable cause." 138 S. Ct. at 590 (internal citations and quotation marks omitted).

occupants on the other side of the door. This conduct smacks of Hollywood action movies more than responsible local policing. It is correspondingly unsurprising, therefore, that there is apparently no case incorporating these precise facts in finding the absence of qualified immunity.

In sum, Defendants are not entitled to qualified immunity in the instant case because their actions with respect to both the search and seizure were not objectively reasonable. *See Harlow*, 457 U.S. at 818. The Court finds that Defendants could have easily anticipated that their conduct would give rise to liability for damages, and that the shield of qualified immunity is therefore unnecessary to ensure that they, or other law enforcement officers faced with similar circumstances, are not chilled in the performance of their duties. *See Davis v. Scherer*, 468 U.S. 183, 195 (1984). Defendants exercised their power irresponsibly, and by plain incompetence trammeled Plaintiff's Fourth Amendment rights. *See Hupp*, 2019 WL 3330443, at *3. The applicable law, with respect to warrantless entry into a private dwelling, exigent circumstances, the emergency doctrine, and probable cause to arrest, was all clearly established. Therefore, Defendants' written motion for summary judgment on the qualified immunity issue (ECF No. 60) and oral motion for qualified immunity at the close of trial, as more fully briefed in their memorandum in support of qualified immunity (ECF No. 129), are denied.

## CONCLUSION

After careful consideration of the relevant motion, memoranda, responses, and replies, and in light of the evidence presented at trial, the Court finds that Defendants Lindsay, Jacko, Wean, and Wiedemann are not entitled to qualified immunity for their

violations of Plaintiff's Fourth Amendment rights. Accordingly, for the reasons stated above, Defendants' motion for summary judgment on the qualified immunity issue (ECF No. 60) and oral motion for qualified immunity are DENIED.

**IT IS SO ORDERED.**

<div style="margin-left: 45%;">

/s/Bruce Howe Hendricks
United States District Judge

</div>

August 13, 2019
Charleston, South Carolina