UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| AKILIOU SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:16-655-BHH |
| | ) | |
| vs. | ) | |
| | ) | **OPINION AND ORDER ON MOTION** |
| JAMES L. JACKO, ZACH LINDSAY, | ) | **FOR JUDGMENT AS A MATTER OF** |
| JOHN WIEDEMANN, and MATTHEW | ) | **LAW, OR FOR A NEW TRIAL, OR FOR** |
| WEAN, in their respective individual | ) | **A NEW TRIAL NISI REMITTITUR** |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the Court on Defendants' post-trial motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), or in the alternative, for a new trial pursuant to Rule 59(a), or in the alternative, for a new trial *nisi remittitur*. (ECF No. 131.) The jury trial in this case was completed on June 21, 2019. (ECF No. 120.) Defendants James L. Jacko ("Jacko"), Zach Lindsay ("Lindsay"), John Wiedemann ("Wiedemann"), and Matthew Wean ("Wean") (collectively "Defendants"), filed the instant motion on July 19, 2019. (ECF No. 131.) Plaintiff Akiliou Smith ("Plaintiff") filed a response in opposition August 2, 2019. (ECF No. 132.) Defendants filed a reply on August 9, 2019. (ECF No. 133.) The matter is ripe for disposition and the Court now issues the following ruling.

**BACKGROUND AND SUMMARY OF TRIAL EVIDENCE**

In this damages action brought pursuant to 42 U.S.C. § 1983, Plaintiff alleged that Defendants violated his rights under the Fourth Amendment to the U.S. Constitution to

be free from the unreasonable search of his home, from the unreasonable seizure of his person, and from the use of excessive force. It is undisputed that Defendants possessed neither a warrant nor consent when Defendant Jacko kicked in the door of Plaintiff's home, entered along with Defendants Wean and Wiedemann, seized Plaintiff in the kitchen area, and removed him from the home in handcuffs. The testimonial, documentary, and electronic evidence at trial established the following facts.

On December 17, 2015, Ms. Angeline Foggy came home to her house on Ghana Street to find an unknown man sitting on her sofa watching television. By Ms. Foggy's description the man was African American, had an afro haircut of approximately one to two inches in length, was of slim build weighing approximately 150 pounds, stood approximately five foot five inches (5'5") tall, had a small amount of facial hair, and was wearing jeans and a jean jacket. She further estimated that the man was between twenty-five (25) and thirty (30) years old. Ms. Foggy called 911 and told the man—who gave his name as "Shawn Freeman"—to leave, which he did, walking directly past her while she stood on the porch near the doorway. Ms. Foggy gave her description of the intruder to the 911 operator and to the Sheriff's Deputies that eventually responded to her house. While Ms. Foggy was still on the phone with 911, now standing inside her doorway, the trespasser returned to her yard in an attempt to retrieve his belongings, which he had left inside the house in a plastic storage bin and a backpack. Ms. Foggy told him to leave her yard and he complied without having retrieved his belongings. More than thirty (30) minutes elapsed between the time Ms. Foggy called 911 and the Sheriff's Deputies responded to her home. While the Deputies were responding to the scene, the

911 dispatcher gave a caution over the radio for a "Deshawn Freeman," a forty-one (41) year old black male who had a previous conviction for assault on a police officer. However, the dispatcher clarified that the name "Deshawn Freeman" was not a perfect match for the name provided by the intruder, "Shawn Freeman."

Ms. Foggy informed the Sheriff's Deputies that her laptop had been moved from its usual place on her bedside table to the living room. At some point, the Deputies discovered that the trespasser had gained access to Ms. Foggy's home by removing an air conditioning unit from the window. The 911 dispatch call was elevated from a trespass to a burglary because the Deputies deemed removal of the air conditioner to be an indication that the suspect may have intended to steal Ms. Foggy's belongings, such as her laptop, while inside the home.

At all times relevant to the case, Defendant Lindsay was a Sheriff's Deputy with Charleston County and a K-9 handler. On the night in question, Lindsay responded to Ms. Foggy's house with his K-9, Zeus, a German shepherd weighing approximately eighty (80) pounds. Lindsay was wearing green tactical BDU pants, a black shirt, and a black tactical vest with Velcro patches indicating he was a member of the Sheriff's Office. Zeus was also wearing a K-9 vest that had the word "Sheriff" on it. Lindsay testified that Ms. Foggy told her description of the trespass/burglary suspect to Defendant Jacko first, then Jacko relayed the information to Lindsay. After giving Zeus time to gain a scent to track, Lindsay set off into the neighborhood following Zeus who was pulling hard, which showed that Zeus was not merely sniffing around but was following a scent. Zeus turned onto Kano street, on which Plaintiff's home is located.

When Zeus neared the end of Plaintiff's driveway, he lifted his head indicating an "air scent." The significance of the air scent meant only that Zeus detected a person in close vicinity, not that the scent he smelled in the air somehow matched the scent he had been tracking on the ground. In his trial testimony, Lindsay confirmed that Plaintiff was on his property for the duration of their interaction, and that Plaintiff did nothing illegal when Lindsay observed him. Lindsay further testified that when he first saw Plaintiff, he did not believe Plaintiff was posing a threat to anyone. Lindsay stated that he saw Plaintiff "lurch behind a vehicle" parked in the driveway, which caused Lindsay to shine a flashlight on the vehicle. It was dark on the evening in question, and multiple witnesses testified that the bulb in the street light at the end of the driveway was not functional.

For his part, Plaintiff disputed that he lunged behind the vehicle in the driveway. He was outside taking out the trash when someone at the end of the driveway pointed a flashlight at him and said, "Hey you, come here." Plaintiff stated that the tone of this verbal command, the fact that he did not recognize the individual, the fact that the individual had a large dog with him, and the fact that Plaintiff is "not too fond of dogs," caused him to run back into his house. In his report, Lindsay stated that he said, "Show me your hands," to Plaintiff in the driveway. Jacko, who was also on scene at the time, stated that Lindsay said, "Sheriff's Office, stop." At trial, Lindsay was not certain what he said because in high stress situations one often cannot remember exactly what was said.

Lindsay and Plaintiff offered conflicting testimony about whether Plaintiff struggled to enter the house when he ran to the door. Lindsay stated that from his perspective

Plaintiff's entry was "a little bit abnormal," that he "jiggled the door handle," and it "appeared to be a struggle" for him to get into the house. These conclusions led Lindsay to have a "gut feeling" that "maybe [Plaintiff] doesn't know this residence or belong at this residence." Lindsay further testified that he "had no clue" if Plaintiff was the suspect from Ms. Foggy's house or not, which is why he "showed restraint and did not deploy [his] dog." For his part, Plaintiff denied that he had any trouble getting into his own house and stated that he did not fumble at the door.

The door in question opened directly into the home's kitchen. When Plaintiff reentered the house he locked the door, told his mother in law ("Ms. Davis")—who was sitting at the kitchen table with Plaintiff's wife ("Mrs. Smith") and children—that someone was chasing him with a dog, and followed her advice to call 911 and report the situation. The substance of Plaintiff's 911 call corroborates that he was not initially aware that the individual in the driveway with a dog was a law enforcement officer. Plaintiff began relaying Mrs. Smith's observations of the individuals outside the door to the 911 operator, such as, "They got guns and stuff." Plaintiff testified that when the Sheriff's Deputies ultimately entered the house and he realized they were law enforcement officers, he was confused, "When they said I needed to go outside, I didn't even know why they wanted me outside."

Defendant Lindsay testified that when he followed Plaintiff and ran up to the door he heard yelling and screaming from inside the residence *before* he pounded on the door. He denied using any profanity when trying to gain entry into the home. Ms. Davis and Mrs. Smith both testified that no one was screaming or yelling in the kitchen until an

unidentified individual began pounding on the door and shouting, "Open the fucking door!" They stated that the children began crying when the pounding began. Ms. Davis and Mrs. Smith further testified that when Ms. Davis asked the individuals who they were, they responded, "This is the fucking police!" Defendants repeatedly denied this assertion, stating that as Sheriff's Deputies they would never refer to themselves as "the police." Ms. Davis testified that she responded to the Deputies' demand that she open the door by saying, "I have my kids in here." Ms. Davis further testified that one of the individuals on the other side of the door said, "You have a fugitive in your house," to which she responded, "He's not a fugitive, he's my son in law."

Defendant Lindsay was the first Sheriff's Deputy to attempt to force entry into the home but was unsuccessful because he had Zeus with him on the stoop. Defendant Jacko joined Lindsay at the door and Lindsay told Jacko to kick the door in. After two unsuccessful front-kicks, Jacko successfully back-kicked the door in, forcing the lock through the wood of the doorframe. Whereupon Jacko, knocked off balance by his kick, fell off the stoop, collided with Zeus, was bitten by Zeus, drew his service weapon, then holstered the weapon when he saw women and children sitting at the kitchen table.

Lindsay stayed outside the home with Zeus while Jacko entered the dwelling, followed shortly thereafter by Defendants Wean and Wiedemann. Once in the home, Jacko never asked Ms. Davis, Mrs. Smith, or the children seated at the kitchen table whether they were safe. When Ms. Davis and Mrs. Smith confronted Jacko about his unauthorized entry into the house, he stated, "We need to speak to him and see him," referring to Plaintiff. Jacko acknowledged, in his testimony, that no one in the kitchen

6

appeared to be in physical danger. Walking through the kitchen, Jacko encountered Plaintiff in a hallway where the kitchen and living room meet. Asked what conclusions he drew upon observing Plaintiff up close, Jacko responded, "I didn't have any immediate conclusion at that time. I just knew that a man may have forced entry into the home." Plaintiff, who is five foot and seven inches (5'7") in height, and weighed 220 pounds, was wearing his Atlantic Pest Control uniform, consisting of khaki cargo pants, a green company polo shirt, and a green company jacket bearing the Atlantic Pest Control emblem. He was clean shaven due to a company policy that did not allow facial hair, and his hair was closely cut also due to company requirements. None of the Deputies that entered the home asked Plaintiff for his name or identification, but simply told him that he needed to come outside.

Jacko attempted to seize Plaintiff and place him in handcuffs. Plaintiff repeatedly questioned the Sheriff's Deputies why he was being detained and why they were requiring him to leave the dwelling rather than talking to him inside the home. Jacko initially had trouble getting the handcuffs on Plaintiff, but the extent of Plaintiff's resistance was to pull his hand away and put his arms at his sides when Jacko grabbed his hand. Wean helped Jacko get one of Plaintiff's hands into the handcuffs. Wiedemann never touched Plaintiff, but drew his taser and held it at the "low ready" position in order to gain Plaintiff's compliance with Jacko's efforts to handcuff him. At one point, Wiedemann pointed the taser at Plaintiff and told him that he needed to comply and come outside the home, which Plaintiff ultimately did. Mrs. Smith testified that when she verbally objected to Defendants' actions toward her husband, Wiedemann responded,

"Shut up or I'll tase you too." Wiedemann denied making any such statement.

Once Plaintiff was standing in his driveway in handcuffs, Deputy Wean drove around the corner to Ms. Foggy's house and brought her to Plaintiff's driveway in order to identify him as the suspect from the trespass/burglary. Ms. Foggy testified that one of the Deputies shined a light on Plaintiff, at which point she told them that Plaintiff was not the trespass/burglary suspect. When asked at trial whether Plaintiff "looked the same" as the suspect, Ms. Foggy responded, "no." When asked if Plaintiff even looked close to the suspect in appearance, Ms. Foggy responded, "no." Plaintiff testified that from his vantage point in the driveway he observed Ms. Foggy shake her head inside Defendant Wean's Sheriff's vehicle, but that the Deputies did not take the handcuffs off of him at that time. Defendants first ran a search on Plaintiff through the National Crime Information Center ("NCIC") to determine whether he had any outstanding warrants prior to releasing him.

Deputy Brian Moniz ("Moniz") was working the same squad as the named Defendants on the evening in question. He responded to Ms. Foggy's house and received her description of the suspect. When Lindsay was on the stoop of Plaintiff's home and Jacko breached the door, Moniz was about twenty (20) yards away, maintaining a perimeter in the front yard. Moniz observed Plaintiff when he was removed from the home and escorted to the driveway in handcuffs. Moniz testified that when Plaintiff walked out of the door into the porch light he was able to see that Plaintiff was "not close" to the weight given in the description of the trespass/burglary suspect.

At the conclusion of trial, the Court instructed the jury on the law, including the

following charge regarding exigent circumstances:

It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable subject to certain exceptions. The presence of exigent circumstances is one such exception to the warrant requirement.

In determining whether an exigency existed when the search commenced, you must determine whether the circumstances would cause law enforcement officers to form an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within.

For law enforcement officers to successfully assert the exigent circumstances doctrine, they must possess a reasonable suspicion that such circumstances exist at the time of the search or seizure in question. Exigent circumstances vary from case to case, and a determination of the issue is of necessity fact-specific. Examples of such exigencies might include, but are not limited to, risk of danger to law enforcement or to other persons inside or outside a dwelling. When policemen, firemen, or other public officers are confronted with evidence which would lead a prudent and reasonable official to see a need to act to protect life or property, they are authorized to act on that information, even if ultimately found erroneous. This version of exigent circumstances is called the "emergency doctrine."

For exigent circumstances to have existed to justify the Defendants' warrantless entry into the home under the emergency doctrine, the defendants must have had an objectively reasonable belief that an emergency existed inside the home that required immediate entry to render assistance or prevent harm to persons or property within. The defendants bear the burden of demonstrating the existence of such exigent circumstances. This "emergency exigency" exception to the warrant requirement justifies entry as part of the service and protective functions of the police as opposed to their law enforcement functions.

In order for exigent circumstances to justify a warrantless entry of a home, the conduct of law enforcement preceding the exigency must be reasonable in the same sense. Therefore, the exigent circumstances exception applies when law enforcement does not gain entry to the premises by means of an actual or threatened violation of the Fourth Amendment. This means that if law enforcement creates the exigency by engaging in or threatening to engage in conduct that violates the Fourth Amendment, the forced entry of the home that follows is unconstitutional.

After due deliberation, the jury found that Defendants Jacko and Lindsay violated

Plaintiff's right to be free from unreasonable searches under the Fourth Amendment.

(ECF No. 122 at 1.) The jury further found that Defendants Jacko, Wiedemann, and Wean violated Plaintiff's right to be free from unreasonable seizure under the Fourth Amendment. (*Id.* at 2.) Thereafter, the Court posed the following special interrogatory to the jury regarding Defendants Jacko and Lindsay: "Based on what he knew at the time, did Deputy [Jacko/Lindsay] have an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within Plaintiff Akiliou Smith's house?" (ECF No. 122-1 at 1–2.) The jury responded, "No," with respect to both Defendants Jacko and Lindsay. (*Id.*) The Court posed the following special interrogatory to the jury regarding Defendants Jacko and Wean: "Based on what he knew at the time that he entered the residence, did Deputy [Jacko/Wean] have an objectively reasonable belief that he had probable cause to arrest Plaintiff Akiliou Smith?" (*Id.*) The jury responded, "No," with respect to both Defendants Jacko and Wean. (*Id.*) Finally, the Court posed a slightly different special interrogatory to the jury regarding Defendant Wiedemann: "Based on what he knew at the time, did Deputy John Wiedemann have an objectively reasonable belief that he possessed probable cause to assist the other Deputies in seizing Plaintiff Akiliou Smith?" (*Id.* at 2.) The jury responded, "Yes," with respect to Defendant Wiedemann. (*Id.*)

<u>**LEGAL STANDARD**</u>

**Rule 50(b) Motion for Judgment as a Matter of Law**

No later than 28 days after the entry of judgment, a party who has moved pursuant to Rule 50(a) for judgment as a matter of law during a jury trial may file a renewed motion for judgment as a matter of law and may include an alternative or joint

request for a new trial under Rule 59. Fed. R. Civ. P. 50(b). "A Rule 50(b) motion should be granted if a district court determines, without considering the credibility of the witnesses or weighing the evidence, that substantial evidence does not support the jury's findings." *Kane v. Lewis*, 604 F. App'x 229, 234 (4th Cir. 2015) (citing *White v. Cnty. of Newberry*, 985 F.2d 168, 173 (4th Cir. 1993)).

**Rule 59(a) Motion for New Trial**

Following a jury trial, the court may, on motion, grant a new trial on all or some of the issues for any reason for which a new trial has heretofore been granted in an action at law in federal court. Fed. R. Civ. P. 59(a). "[A] jury verdict may be set aside and the case remanded for a new trial when it is not possible to reconcile the findings." *TransDulles Center, Inc. v. USX Corp.*, 976 F.2d 219, 227 (4th Cir. 1992). "The court should grant a new trial only if 1) the verdict is against the clear weight of the evidence, 2) is based on evidence which is false, or 3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 650 (4th Cir. 2002) (citing *Knussman v. Maryland*, 272 F.3d 625, 639 (4th Cir. 2001)).

**New Trial *Nisi Remittitur***

The Fourth Circuit Court of Appeals has explained motions for new trial *nisi remittitur* premised upon an excessive punitive damages award in the following manner:

> At the outset, we note that a remittitur, used in connection with Federal Rule of Civil Procedure 59(a), is the established method by which a trial judge can review a jury award for excessiveness. Remittitur is a process, dating back to 1822, by which the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award. *See Blunt v. Little,* 3 F. Cas. 760 (C. C. Mass. 1822) (No. 1578) (Story, J.). And the permissibility of remittiturs is now settled. *See* 11 Charles Alan Wright,

11

Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure,* § 2815, at 163 (1995). Indeed, if a court finds that a jury award is excessive, it is the court's duty to require a remittitur or order a new trial. *See Linn v. United Plant Guard Workers, Local 114,* 383 U.S. 53, 65–66, 86 S. Ct. 657, 664–65, 15 L.Ed.2d 582 (1966).

Absent any constitutional challenge to the amount of a jury's punitive damage award, *see BMW of North America v. Gore,* 517 U.S. 559, 116 S. Ct. 1589, 134 L.Ed.2d 809 (1996) (holding "grossly excessive" punitive damage award violates the Fourteenth Amendment's Due Process Clause), a federal district court reviews such an award by applying the state's substantive law of punitive damages under standards imposed by federal procedural law.[2] Thus, the district court is "to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." *Browning–Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 279, 109 S. Ct. 2909, 2922, 106 L.Ed.2d 219 (1989); *see also Defender Indus., Inc. v. Northwestern Mut. Life Ins. Co.,* 938 F.2d 502, 504–05 (4th Cir. 1991) (en banc).

> FN2. South Carolina substantive law directs that a jury deciding the amount of punitive damages to be awarded consider several factors: (1) the defendant's degree of culpability; (2) the duration of the defendant's conduct; (3) the defendant's awareness or concealment of its conduct; (4) the existence of similar past conduct by the defendant; (5) the likelihood that the jury's punitive damage award will deter the defendant or others from like conduct; (6) whether the award is reasonably related to the harm likely to result from such conduct; (7) the defendant's ability to pay; and (8) any "other factors" deemed appropriate. *See Gamble v. Stevenson,* 305 S.C. 104, 406 S.E.2d 350, 354 (1991) (establishing factors for post-trial state court review of jury verdicts); *Orangeburg Sausage Co. v. Cincinnati Ins. Co.,* 316 S.C. 331, 450 S.E.2d 66, 73 (Ct. App. 1994) (requiring *Gamble* factors to be considered by the jury), *cert. denied*, 516 U.S. 928, 116 S. Ct. 331, 133 L.Ed.2d 231 (1995); *see also Mattison v. Dallas Carrier Corp.,* 947 F.2d 95, 109–10 (4th Cir. 1991) (same).

*Atlas Food Sys. & Servs., Inc. v. Crane Nat. Vendors, Inc.,* 99 F.3d 587, 593–94 (4th Cir. 1996). The Due Process Clause of the Fourteenth Amendment "imposes a substantive limit on the size of punitive damages awards." *Honda Motor Co., Ltd. v. Oberg,* 512 U.S. 415, 420 (1994). "To the extent an award is grossly excessive, it furthers no legitimate

purpose and constitutes an arbitrary deprivation of property." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003). In *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), the Supreme Court established three guideposts for courts reviewing punitive damages awards: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418 (citing *Gore*, 517 U.S. at 575).

## DISCUSSION

### I. Whether Defendants Are Entitled to Directed Verdict

#### A. Deputy Lindsay

Defendants argue that Deputy Lindsay is entitled to a directed verdict on the unlawful search claim because there was insufficient evidence to support the jury's finding that Lindsay is liable for the unlawful search. (ECF No. 131-1 at 3.) Specifically, Defendants argue that Lindsay is entitled to judgment as a matter of law on the search claim because he never entered Plaintiff's residence and cannot be held liable in his individual capacity for a search in which he did not physically participate. (*Id.*)

The Court holds that substantial evidence support's the jury's finding that Lindsay participated in the unlawful search. Lindsay's own undisputed testimony established that he was the first to shine a light on Plaintiff in the driveway, that he ordered Plaintiff to stop and speak to him, that he chased Plaintiff to the door of the residence when Plaintiff retreated indoors, that he personally tried to force the door open with his shoulder, and

that he told Deputy Jacko to breach the door while standing nearby with his K-9, Zeus. Lindsay further testified that he told Deputies Wean and Wiedemann to enter the home and assist Deputy Jacko, who was in the midst of seizing Plaintiff. Lindsay's actions instigated and were integral to a continuous chain of events that resulted in law enforcement's forceful, warrantless entry into Plaintiff's home. The fact that Lindsay never personally crossed the threshold is immaterial. He may be held liable where he intentionally participated in conduct constituting a violation of Plaintiff's rights even if he did so "in a manner that might be said to be 'indirect'—such as ordering or helping others to do the unlawful acts, rather than doing them him[self]." *See Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001). Therefore, Lindsay is not entitled to judgment as a matter of law and his motion is denied.

Defendants' additional arguments in support of their motion for a directed verdict as to Deputy Lindsay rehash previous assertions of exigent circumstances justifying an exception to the warrant requirement. (*See* ECF No. 131-1 at 4–6.) Footnote one to Defendants' motion states that there is "a fair amount of overlap" between the arguments made regarding Defendants' entitlement to judgment as a matter of law and the arguments made regarding Defendants' entitlement to qualified immunity. (*Id.* n.1.) Accordingly, Defendants seek to reference and incorporate their memorandum in support of qualified immunity. (*Id.*) The Court has since ruled on the qualified immunity issue, finding that none of the Defendants are entitled to qualified immunity under the facts and circumstances of this case. (*See* ECF No. 135.) The Court's reasoning and conclusions regarding exigent circumstances as they pertain to the qualified immunity

ruling apply with equal force here, and the Court declines to repeat its prior analysis. In its August 13, 2019 Order, the Court considered and rejected Defendants' assertion that exigent circumstances justified the search. (*See* ECF No. 135 at 13–18.) Accordingly, Lindsay is not entitled to a directed verdict on the basis that exigent circumstances rendered his conduct reasonable for Fourth Amendment purposes.

### B. Deputy Jacko

Defendants argue that Deputy Jacko is entitled to a directed verdict on the unlawful search claim because his warrantless entry into the home was based upon the supposed existence of exigent circumstances, and on the unlawful seizure claim because Plaintiff's "flight" upon sight of law enforcement in a "high crime area" was sufficient justification to detain Plaintiff. (ECF No. 131-1 at 6–8.) Specifically, Defendants argue that Jacko's entry into the residence was "based on his personal observations at the door as well as the information he had received about a suspicious man who had immediately fled upon seeing and being addressed by Deputy Lindsay, and the information that Lindsay had seen the man appear to struggle to get into the residence." (*Id.* at 7.)

Defendants' arguments are without merit. The Court holds that substantial evidence supports the jury's findings that Jacko conducted an unlawful search of Plaintiff's home and effected an unlawful seizure of Plaintiff's person. Deputy Jacko kicked in the locked door of Plaintiff's home without a warrant, entered the home, handcuffed Plaintiff, and removed him from the home against his will. Adequate evidence was introduced to rebut Jacko's assertions that his forceful, warrantless entry into the

home was justified by the presence of exigent circumstances. Invoking the collective knowledge doctrine, Defendants ascribe Deputy Lindsay's observations of Plaintiff's appearance, characteristics, and behavior outside the home to Deputy Jacko. (*See* ECF No. 131-1 at 7 n.2 (citing *United States v. McRae*, 336 F. App'x 301, 305 (4th Cir. 2009).) However, the trial evidence established that Plaintiff's build, weight, clothing, lack of facial hair, and haircut did not match the trespass/burglary suspect from the home intrusion at Ms. Foggy's. Plaintiff denied that he "lurched behind the car" or had any trouble entering the home. Moreover, Lindsay acknowledged that he did not observe Plaintiff do anything illegal outside the home and that he had "no clue" whether Plaintiff was the suspect from Ms. Foggy's. Thus, ascribing Lindsay's knowledge to Jacko does not assist Jacko in substantiating the presence of exigent circumstances.

Although Defendants asserted the emergency doctrine as justification for the warrantless entry, and it was undisputed that Jacko immediately saw Ms. Davis, Mrs. Smith, and the children sitting at the kitchen table when he kicked the door in, Jacko never asked the kitchen occupants whether they were in distress or whether Plaintiff was an intruder before advancing into the home. Despite Plaintiff's obvious mismatch for several readily identifiable descriptors of the suspect from Ms. Foggy's, Jacko testified that he "didn't have any immediate conclusion" when he was able to observe Plaintiff up close inside the home. Jacko failed to ask Plaintiff for his name or identification prior to seizing him, basic investigative procedure which could have immediately eliminated Plaintiff as a suspect and curtailed the scope of the search. Jacko's testimony at trial was the first time in this litigation that Defendants presented the theory that the area where

Plaintiff's home was located was a "high crime area." Defendants' evidence to support the "high crime area" designation consisted of anecdotal testimony by Defendants themselves. Plaintiff presented testimony to rebut the assertion that it is a high crime area, and the jury could have reasonably credited this evidence over the testimony offered by Defendants. Moreover, the Court finds that the evidence presented could support the conclusion that Plaintiff's retreat from the curtilage of his home into the home itself mere feet away did not constitute "flight" in the relevant sense. Finally, a reasonable evaluation of Plaintiff's 911 call that occurred while Defendants were banging on the door could lead to the conclusion that Plaintiff was initially unaware the person chasing him with a dog was a law enforcement officer. Deputy Jacko is not entitled to a directed verdict on either the unlawful search claim or the unlawful seizure claim and the motion is denied.

### C. Deputies Wean and Wiedemann

Defendants argue that Deputies Wean and Wiedemann are entitled to a directed verdict on the unlawful seizure claim because they arrived after forced entry had been made, were told that Deputy Jacko needed assistance inside the home, and did not know why Jacko was attempting to seize Plaintiff when they rendered assistance. (ECF No. 131-1 at 9.) Defendants rely on the fact that the jury found Deputies Wean and Wiedemann not liable on the unreasonable search claim for the assertion that Wean and Wiedemann were "lawfully in the residence." (*Id.*) They assert that "no case, either before the Supreme Court or in the Fourth Circuit, has imposed liability for unlawful seizure when an officer arrives on scene after the initial event and merely provides

assistance solely due to a call for help by a fellow officer[,]" and "[t]his [sic] especially true of Deputy Wiedemann who never touched Plaintiff and merely pointed, without deploying, his taser." (*Id.*)

These assertions are without merit. By their own testimony, Deputies Wean and Wiedemann had received the description of the trespass/burglary suspect from Ms. Foggy's residence and were searching the local area for the suspect. They were in radio contact with the other Deputies that responded to Ms. Foggy's and with dispatch as the investigation proceeded. There is no plausible argument that Wean and Wiedemann thought Jacko was seizing Plaintiff for some reason unrelated to the trespass/burglary at Ms. Foggy's. They had the same opportunity as Jacko to observe that Plaintiff's appearance and characteristics did not match the description of the suspect. They had the same opportunity to ask Plaintiff for his name and identification but failed to do so. Wean physically grabbed Plaintiff's wrist and helped Jacko place Plaintiff in handcuffs. Wiedemann drew his taser and pointed it at Plaintiff in order to compel Plaintiff's compliance with the seizure. Substantial evidence supported the jury's findings that Wean and Wiedemann unlawfully seized Plaintiff, and the motion for a directed verdict is denied.

## II. Whether the Court Improperly Applied the Arrest Standard for the Unlawful Seizure Claim

In their next bid for a new trial, Defendants argue:

[T]he primary question that needed to be answered in this matter was whether Plaintiff's seizure was an investigative detention to which the reasonable suspicion standard applies or a custodial arrest to which the probable cause standard applies. Though the proper standard under these factual circumstances is not entirely clear, the weight of authority instructs that Plaintiff's initial seizure was not an arrest, nor was it converted to an

> arrest at any time thereafter. Had the jury considered the seizure claim under the reasonable suspicion standard, it is likely they would have found in favor of Defendants on the seizure claim.

(ECF No. 131-1 at 10.) In support of this assertion, Defendants reference the same case law and arguments they raised at trial and contend that the Court's application of the probable cause standard to the unlawful seizure claim constitutes error requiring a new trial. (*See* ECF No. 131-1 at 10–12.)

Defendants repeatedly focus on the fact that the detention only lasted eleven minutes. (*See id.*) However, the Court specifically considered this factor in rendering its decision that the detention was an arrest not merely an investigative detention, finding that other factors outweighed the brevity of the detention. First, the Court determined that the typical setting where an "investigative detention" takes place is on the public streets, or in public places, a factor which was certainly present in the seminal cases of *Terry v. Ohio*, 392 U.S. 1 (1968) and *Illinois v. Wardlow*, 528 U.S. 119 (2000). *See United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010) (commending government for declining to defend district court's suppression ruling upholding a warrantless search and seizure in the curtilage of defendant's home as a mere *Terry* stop); *see also United States v. Martinez*, 406 F.3d 1160, 1165 (9th Cir. 2005) ("Certainly, the usual rules pertaining to *Terry* stops do not apply in homes."). Second, the Court recognized that the purpose of an investigative detention is to conduct a quick pat down for weapons or possibly contraband depending on the circumstances. *See, e.g.*, *Adams v. Williams*, 407 U.S. 143, 146 (1972) ("The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the

frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law."); *Fla. v. Royer*, 460 U.S. 491, 498–99 (1983) (stating that governmental purpose to verify or dispel suspicion of criminal activity may "warrant temporary detention for questioning on less than probable cause where the public interest involved is the suppression of illegal transactions in drugs or of any other serious crime").

Considering the specific circumstances of this case, the Court found that the Deputies' forceful removal of Plaintiff from his own home—in contradistinction to a public place—weighed against a determination that the seizure was merely an investigative detention and in favor of a determination that the seizure was an arrest. Moreover, it was evident to the Court that the purpose of the seizure was not to detect the presence of weapons or contraband. The opportunity for an investigative detention of that sort was when Deputy Jacko entered the home and first interacted with Plaintiff. Defendants presented repeated testimony that the kitchen is the most dangerous room in the house because it contains weapons of opportunity. But the Deputies involved in the detention *did not* effect the minimal seizure necessary for the purpose of frisking Plaintiff for weapons,[1] or even for the purpose of asking Plaintiff his name and comparing his appearance and characteristics to the suspect. Rather, Defendants insisted that Plaintiff submit to removal from his home without conducting basic investigative steps that would have eliminated Plaintiff from suspicion.

If it is even possible for a law enforcement officer to conduct a *lawful* "investigative detention" inside a private dwelling that he (Jacko) has just entered *unlawfully*, an

---

[1] It is worth noting that there was no indication that the suspect from Ms. Foggy's residence was armed or acting in a threatening manner.

abstract point upon which the Court will not postulate, the Deputies abdicated the opportunity for an investigative detention when they failed to conduct the seizure in a manner consistent with the scope of an investigative detention. *See Dunaway v. New York*, 442 U.S. 200, 210 (1979) ("Because Terry involved an exception to the general rule requiring probable cause, this Court has been careful to maintain its narrow scope."). Instead, the Deputies: (1) handcuffed Plaintiff; (2) pointed a taser at him; (3) removed him from his home against his will, against the protestations of his family, and without explaining why they could not simply talk with him inside; (4) kept him in the driveway until Ms. Foggy was produced to identify him as the suspect; and (5) kept him in handcuffs to conduct a NCIC check on him even after Ms. Foggy confirmed that he was not the suspect. The Court found that the constellation of these facts, taken together, outweighed the fact that the detention was relatively short in duration. Accordingly, the Court determined that the seizure was an arrest, not an investigative detention.

Defendants argue that "[a]n investigative detention is converted [sic] a custodial arrest when the suspect is removed from a private place and then involuntarily taken to the police station for further investigation." (ECF No. 131-1 at 11 (citing *Dunaway*, 442 U.S. 200; *Davis v. Mississippi*, 394 U.S. 721 (1969)).) But the Court disagrees with Defendants that the Supreme Court's holding in *Dunaway* created a requirement that an individual be transported to the police station before a detention is converted into an official seizure necessitating probable cause as a predicate to reasonableness. Rather, the Supreme Court's reasoning and analysis in that case focused on the collective

21

features of the detention at issue. *See Dunaway*, 442 U.S. at 212–214 (holding that probable cause was necessary "whether or not [the detention was] technically characterized as an arrest" where the individual was "not questioned briefly where he was found," but "taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room," and "never informed that he was 'free to go'; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody"). In the instant case, Plaintiff was not questioned briefly where he was found, but was taken from his own home in handcuffs and in full view of his neighbors, then held in the driveway until the Deputies conducted a sort of field-expedient lineup procedure. Plaintiff was never informed that he was "free to leave" (which in this case would have meant simply remaining in his own home) and would have been tased if he had refused to accompany the Deputies or tried to avoid being handcuffed. In sum, "the detention of [Plaintiff] was in important respects indistinguishable from a traditional arrest." *Id.* at 212.

Moreover, the Court disagrees with Defendants' assertion that the verdict would likely have been different if the reasonable suspicion standard had been applied. Defendants argue that the Deputies "were clearly aware of *some* criminal activity afoot as they were already responding to a burglary and actively searching for the suspect. Once Plaintiff bolted indoors when approached by a uniformed deputy, and given the dog alert, the deputies were reasonably suspicious that Plaintiff could be the burglar." (*See* ECF No. 131-1 at 12.) But this is exactly the kind of generalized appeal to suspicion that the reasonable suspicion standard is designed to avoid. *See Terry v. Ohio*, 392 U.S.

1, 21 (1968) ("[I]n justifying the particular intrusion the police officer must be able to point to *specific and articulable facts* which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (emphasis added)). Defendants conceded at trial that Zeus's "air scent" meant only that a person was nearby, not that the scent detected in the air matched any scent Zeus had been following on the ground. And the Court finds that Defendants failed to articulate specific facts that would lead an officer of ordinary prudence to believe that Plaintiff committed the burglary or other crime. Upon viewing Plaintiff, a reasonable law enforcement officer would have known that he was not the 150-pound suspect of slim build with facial hair and a one-to-two-inch afro. A reasonable officer would have noticed that Plaintiff's full Atlantic Pest Control work uniform did not match the suspect's clothing in any respect. And a reasonable officer would have considered Ms. Davis and Mrs. Smith's persistent claims that Plaintiff belonged in the home and had done nothing wrong.

Therefore, Defendants' motion for judgment as a matter of law and/or for a new trial is denied to the extent it is premised on alleged legal errors by the Court in deeming the seizure to be an arrest and instructing the jury to apply the probable cause standard instead of the reasonable suspicion standard.

## III. Whether Defendants Are Entitled to a New Trial Because Punitive Damages Must Be Apportioned

Defendants next argue that they are entitled to a new trial because their liability for the punitive damages award cannot be joint and several, and the Court should have submitted an apportionment form to the jury along with the special interrogatories pertaining to qualified immunity issues. (*See* ECF No. 131-1 at 13–16.) Defendants rely

on *McFadden v. Sanchez*, 710 F.2d 907 (2d Cir. 1983), in which the Second Circuit vacated a $200,000 punitive damages award against four police officers involved in an attempted arrest that resulted in the arrestee's death, and remanded for a new trial limited to punitive damages. The *McFadden* court held that "in section 1983 actions liability for punitive damages and their amount must be determined on an individual basis." 710 F.2d at 908. Lastly, Defendants argue that the verdict form was fatally flawed in that it allowed the jury to award punitive damages against *all* Defendants by finding that "any of Defendants' conduct" satisfied the standard for punitive damages set forth in *Smith v. Wade*, 461 U.S. 30 (1983). (*See* ECF No. 131 at 18.)

First, Defendants waived their current objection to the verdict form by failing to lodge a timely, specific objection. Prior to trial, the parties submitted their respective proposed verdict forms to the Court. Defendants submitted a series of intricate verdict forms, including both a general verdict form and a special verdict form for each named Defendant. (*See* ECF No. 133-1.) Defendants' proposed verdict forms addressed the punitive damages question on an individualized basis. (*See id.*) Plaintiff submitted a consolidated verdict form, which, by way of the parties' consent, became the basis from which the Court ultimately generated the final verdict form. At the conclusion of the trial evidence, the Court hosted a charging conference in chambers and consulted with counsel regarding, *inter alia*, the verdict form issue. Defendants' counsel agreed to accept and use Plaintiff's proposed verdict form subject to making certain itemized changes reflected in a redline copy provided to Plaintiff's counsel and the Court. (*See* ECF No. 132-1.) Defendants had ample opportunity to request that punitive damages, if

24

any, be awarded separately against each Defendant, but failed to do so. Likewise, Defendants had every opportunity to change the "any of Defendants' conduct" language to which they now object, but failed to do so. Once the final verdict form was generated, the Court asked the parties on the record if there were any objections to the form as drafted and Defendants did not object. The Court instructed the jury on punitive damages and Defendants did not object to the charge. The jury retired to deliberate with the verdict form agreed to by the parties. The fact that Defendants later raised questions as to how damages might be apportioned in the hypothetical event that some Defendants were entitled to qualified immunity and others were not is immaterial. The fact that, while the jury was deliberating, the Court prepared a draft form for submission to the jury to apportion compensatory and punitive damages among the Defendants on the causes of action for which the jury found in favor of Plaintiff (*see* ECF No. 133-2), is likewise immaterial. The Court determined, based on the trial evidence and general principles applicable to § 1983 actions, that liability and damages, including punitive damages, were joint and several because Plaintiff suffered a single indivisible injury. Thus, the Court declined to submit the draft apportionment form to the jury. At this point, while the jury was already recessed deliberating on the special interrogatories, Defendants' counsel objected to the Court's declination to submit the apportionment form. This objection was untimely as the jury had already been instructed regarding punitive damages, received the verdict form assented to by the parties, deliberated and returned a verdict, received the special interrogatories regarding qualified immunity, and was in the process of deliberating on the special interrogatories.

Federal Rule of Civil Procedure 49(a) states in relevant part, "A party waives the right to a jury trial on any issue of fact raised by the pleadings or evidence but not submitted to the jury unless, *before the jury retires*, the party demands its submission to the jury." Fed. R. Civ. P. 49(a)(3) (emphasis added). Rule 51(c) states in relevant part, "A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). The requirements that an objection be timely and specific are not "meaningless ritual; rather, a clear objection can enable a trial court to correct possible error in short order and without the need for an appeal." *United States v. Bennett*, 698 F.3d 194, 199 (4th Cir. 2012) (addressing the adequacy of objections before the trial court). The Court finds that Defendants failed to preserve in a timely and specific manner their objections to the verdict form as not calling for apportionment of punitive damages and as allowing the imposition of punitive damages against all Defendants based on "any Defendants' conduct." These objections should have been raised when the Court was generating the final verdict form in consultation with counsel, and prior to the jury retiring to deliberate on liability, let alone the special interrogatories. Accordingly, Defendants motion for a new trial on this basis is denied because the issue was waived.

Second, the Court remains unconvinced that the punitive damages award should be apportioned under the facts and circumstances of this case. Defendants have not produced any controlling authority to show that punitive damages must be apportioned in a § 1983 action. The *McFadden* ruling is at most persuasive authority. As regards the appropriateness of collective, vice individual, liability for punitive damages, this case is

distinguishable from *McFadden* on its facts. In *McFadden* the Second Circuit noted:

> The instant case well illustrates the importance of assessing punitive damages individually in section 1983 cases. Though the evidence of each defendant's participation in the episode sufficed to permit a finding of liability for use of excessive force, the jury was entitled to view their roles quite differently in determining the appropriateness and amount of punitive damages. Sergeant Pezzano fired the fatal shot. Officer Ciravolo was observed by one witness repeatedly punching McFadden without provocation. Detective Sanchez was observed holding McFadden's arm. Officer Hear may have done little more than strike McFadden with her pocketbook. A jury properly instructed might well have found varying degrees of culpability and distinguished among the defendants as to the liability of each for punitive damages and the appropriate amount of such damages.

*McFadden v. Sanchez*, 710 F.2d 907, 914 (2d Cir. 1983). In other words, the specific facts in *McFadden* revealed significant differential in the *severity and result* of the defendants' conduct—for example, fatally shooting a suspect versus merely whacking the suspect with a pocketbook—that would tend to support stratification in the apportionment of punitive damages. In contrast, the evidence in this case revealed a succinct, intermingled, continuous course of conduct by four Sherriff's Deputies that effected an overarching violation of Plaintiff's Fourth Amendment rights to maintain the sanctity and privacy of his home and his person free of government intrusion. Because Plaintiff suffered no physical injury from the incident, and because he lacked standing to seek damages for the broken doorframe (Ms. Davis being the property owner), liability for the injury that Plaintiff *did* suffer is not amenable to stratification in the apportionment of punitive damages. For this reason, the Court finds *McFadden* unpersuasive as applied to the specific facts of this case. In short, when the jury underlined the words "reckless" and "callous indifference" on the verdict form under the punitive damages question (*see*

ECF No. 122 at 3), they almost certainly were referring to their evaluation of the character of Defendants' *collective* conduct. The motion for a new trial based on alleged legal error in failing to have the jury apportion punitive damages is denied.

## IV. Whether a New Trial is Required Because the Special Interrogatories Were Improper

Defendants argue that a new trial is required because the special interrogatories submitted to the jury regarding qualified immunity were improper for three reasons: (1) the Court improperly asked the jury to decide questions of law, namely whether Defendants' actions were objectively reasonable, instead of questions of fact; (2) the jury was provided inconsistent questions for two Deputies who were in the same position factually based on the evidence; and (3) the jury returned inconsistent responses for Deputies Wiedemann and Wean. (ECF No. 131-1 at 17–20.) The Court disagrees and denies the motion for a new trial on this basis for the following reasons.

First, disputed issues of material fact precluded the Court from ruling on qualified immunity at the summary judgment stage. The Court submitted special interrogatories to the jury in order to resolve, after all the evidence had been admitted, the factual disputes necessary to decide the qualified immunity question. Defendants specifically critique the Court's use of the phrase, "Based on what he knew at the time, did [the Deputy] have an *objectively reasonable belief* that . . . ." (*See* ECF No. 122-1 (emphasis added).) They suggest that the Court should have used the special interrogatories to ask the jury to decide factual issues such as: "whether Deputy Lindsay announced to Plaintiff that he was with the Sheriff's Office, whether Plaintiff hid behind the vehicle after he saw Deputy Lindsay, whether Plaintiff appeared to have difficulty entering the residence, and whether

Lindsay heard the commotion before he pounded on the door or if he caused the commotion inside." (*See* ECF No. 131-1 at 18.) Defendants cite no authority to support the submission of interrogatories designed to resolve such granular factual findings, and the list of potential questions applicable to the exigent circumstances and probable cause inquiries for four separate Deputies is virtually limitless. Moreover, the special interrogatories prepared by the Court were substantially the same as those proposed by Defendants—e.g., "Based on what he knew at the time he entered the residence, did Deputy Jacko have an *objectively reasonable belief* that exigent circumstances existed to justify entering Plaintiff's house without a warrant?" (ECF No. 132-2 (emphasis added).) "To the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, *it is the responsibility of the defendant to request that the jury be asked the pertinent question*." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2nd Cir. 2007) (emphasis added). Defendants have not shown that the special interrogatories, which mirror their own proposed interrogatories, improperly asked the jury to resolve questions of law, and they did not timely request that the jury be asked the questions they now submit the Court should have asked. Accordingly, the motion for a new trial on this basis is denied.

Second, neither the fact that the special interrogatories for Deputies Wean and Wiedemann were worded differently, nor the fact that the jury returned different responses for Deputies Wean and Wiedemann render the interrogatories improper such that a new trial is required. As the Court noted in its ruling on qualified immunity, it is of no material import that the jury answered the special interrogatory posed regarding

Deputy Wiedemann in the affirmative, thereby indicating their consensus that he had "an objectively reasonable belief that he possessed probable cause to *assist* the other Deputies in seizing [Plaintiff]." (See ECF No. 122-1 at 2 (emphasis added).) The Court posed this interrogatory with slightly different wording than the correlative interrogatories posed regarding Deputies Jacko and Wean in an attempt to avoid confusing the jury about Wiedemann's role in the seizure. Specifically, the Court intended to craft the question in a manner that reflected the state of the evidence, which was that Jacko and Wean laid hands on Plaintiff and placed him in handcuffs, while Wiedemann stood nearby with his taser drawn and never touched Plaintiff. In retrospect, the Court believes this different wording created more confusion than it alleviated. Ultimately, however, the Court's inartful drafting of one special interrogatory does not alter the established fact that Wiedemann's actions were an integral part of a constellation of Deputy behavior that compelled Plaintiff's submission to the handcuffing and unwanted removal from his home. The Court has already ruled that Wiedemann's conduct, as a legal matter, was no less culpable than the other Defendants in effectuating the unconstitutional arrest. (*See* ECF No. 135 at 20 n.4.) Moreover, it is undisputed that Wiedemann had no additional, articulable information, above and beyond that possessed by Jacko and Wean, which would alter the probable cause and objective reasonableness inquiries as to Wiedemann individually. "The answers to special verdicts should be reconciled under any rational theory consistent with the evidence, and equally the answers should be harmonized if possible." *Bristol Steel & Iron Works v. Bethlehem Steel Corp.*, 41 F.3d 182, 190 (4th Cir. 1994) (citing *Gallick v. Baltimore & Ohio R.R.*, 372 U.S. 108, 119 (1963)). "If the case

can be viewed so that the jury's answers to the special verdicts are complete and consistent, that view controls." *Id.* (citing *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962)). "[W]here . . . there is a view of the case that makes the jury's answers to special interrogatories consistent, a reviewing court must resolve them that way." *Talkington v. Atria Reclamelucifers Fabrieken BV*, 152 F.3d 254, 261 (4th Cir. 1998) (citations omitted). The jury's responses to the special interrogatories are reconcilable with one another and with their responses on the verdict form. Therefore, the motion for a new trial premised upon improper special interrogatories is denied.

## V. Whether Defendants Are Entitled to Remittitur of Punitive Damages

Defendants make an alternative request for new trial *nisi remittitur*. "Remittitur, which is used in connection with Fed. R. Civ. P. 59(a), is a process . . . by which the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998) (citation and quotation marks omitted). The decision regarding whether damages are excessive and should be subject to remittitur is within the discretion of this Court. *See Robles v. Prince George's Cty., Maryland*, 302 F.3d 262, 271 (4th Cir. 2002). In their briefs, both Plaintiff and Defendants analyzed the punitive damages amount under the due process framework established in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). (*See* ECF Nos. 131-1 at 20–27; 132 at 20–27.) While a number of Courts of Appeals have allowed or directed district courts to simply enter judgment for the maximum amount of constitutionally acceptable punitive damages, this approach is not "remittitur"

in the purest sense, but rather entry of judgment as a matter of law:

> A constitutionally reduced verdict, therefore, is really not a remittitur at all. A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages. The court orders a remittitur when it believes the jury's award is unreasonable on the facts. A constitutional reduction, on the other hand, is a determination that the law does not permit the award. Unlike a remittitur, which is discretionary with the court and which we review for an abuse of discretion, a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause.

*Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1331 (11th Cir. 1999) (citations omitted). In the instant case, the Court finds it most appropriate to analyze the punitive damages award by a reasonableness standard in light of the facts.

The Court finds that the $500,000 in punitive damages awarded by the jury to be unreasonable and excessive in light of the facts. The imposition of such an award would result in a "miscarriage of justice." *See Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 306 (4th Cir. 1998) (utilizing the third prong of the Rule 59 review standard to determine whether a punitive damages award is so excessive as "to work an injustice"). At the same time, Defendants' violations of Plaintiff's right to be free from unreasonable government intrusion into the sanctity of his home and right to be free from unreasonable government seizure of his person are not to be taken lightly. Defendants seek to paint their conduct as merely an "honest mistake" sterilized by the presence of their "good intentions." (ECF No. 131-1 at 22.) But this characterization fails to acknowledge the recklessness with which they ignored every opportunity to use their experience and intelligence to avoid unconstitutional conduct. Nevertheless, on account of the facts that Plaintiff's entire interaction with the Sheriff's Deputies lasted approximately eleven (11)

minutes, that Plaintiff was not physically injured in any way, and that Plaintiff's emotional injuries—though real—were not so acute as to require medication or counseling, the Court finds that remittitur is required. Accordingly, the Court grants Plaintiff the opportunity to choose a remitted punitive damages amount of $250,000 or to elect a new trial limited to punitive damages only. *Compare Robles*, 302 F.3d at 272 (affirming district court's remittitur of $497,000 punitive damages award to $160,000—which would amount to approximately $230,000 in present value after accounting for consumer price index inflation—where police officers unlawfully tied arrestee to a street light pole with zip ties for ten minutes, but arrestee suffered no physical injuries).

## CONCLUSION

After careful consideration of the parties' briefing and the relevant law, and in light of the evidence presented at trial, the Court hereby GRANTS in part and DENIES in part Defendants Lindsay, Jacko, Wean, and Wiedemann's motion for judgment as a matter of law, or for a new trial, or for a new trial *nisi remittitur* (ECF No. 131). As more fully set forth above, the Court GRANTS remittitur on the punitive damages award to an amount of $250,000. Plaintiff will notify the Court within ten (10) days of this Order being entered, whether he accepts the remitted punitive damages amount or elects a new trial limited to punitive damages only.

**IT IS SO ORDERED.**

/s/Bruce Howe Hendricks
United States District Judge

August 30, 2019
Charleston, South Carolina

33